Ronald E. GALELLA, Plaintiff,

v.

Jacqueline ONASSIS, Defendant.

No. 70 Civ. 4348 (IBC).

United States District Court,
S. D. New York.

March 2, 1982.

Raymond, Schneider, Frank & Feldman, New York City, for plaintiff-respondent; Marvin M. Mitchelson, Steven A. Chernis, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendants-movants; Edward J. Reilly, Alexander D. Forger, John C. Maloney, Jr., Charles Berry, New York City, of counsel.

OPINION

IRVING BEN COOPER, District Judge.

Movants, Jacqueline Onassis (Mrs. Onassis) and Caroline B. Kennedy (Ms. Kennedy), seek an order holding respondent Ronald E. Galella (Galella) in contempt for vio-

lation of our order dated January 8, 1975.[1] Movants allege that on four (4) separate occasions Galella, by his conduct while photographing them, violated certain prohibitions of our order. For his part, Galella denies any wrongdoing and maintains that he has not intentionally violated the distinct purpose of our order.

Qualitatively and quantitatively, we find the total proof adduced by movant forthright, persuasive, convincing—a measure of proof presented that more than meets the imperative test laid down by law. Accordingly, for reasons set forth below, the application is granted in all respects.

The order is sought pursuant to Local Rule 44[2] which states in part:

(b) If the alleged contemnor puts in issue his alleged misconduct or the damages thereby occasioned, he shall upon demand therefor, be entitled to have oral evidence taken thereon, either before the court or before a master appointed by the court.
(c) In the event the alleged contemnor is found to be in contempt of court, an order shall be made and entered (1) reciting or referring to the verdict or findings of fact upon which the adjudication is based; (2) setting forth the amount of damages to which the complainant is entitled; (3) fixing the fine, if any, imposed by the court, which fine shall include the damages found, and naming the person to whom such fine shall be payable; (4) stating any other conditions, the performance whereof will operate to purge the contempt; and (5) directing the arrest of the contemnor by the United States marshal and his confinement until the performance of the condition fixed in the order and the payment of the fine or until the contemnor be otherwise discharged pursuant to law.

## Proceedings to date

The instant motion to hold Galella in contempt is but another step in the long, and often tortuous, history of this action. It was commenced in 1970; a proceeding lasting over a month was held in 1972; our decision was appealed to the Court of Appeals, Second Circuit; and in 1975 we entered a final order permanently enjoining certain practices indulged in by Galella.

Galella originally instituted this action in New York Supreme Court; it was removed to this Court on October 7, 1970.[3] Galella brought suit against Mrs. Onassis and three agents of the United States Secret Service (Walsh, Kalafatis and Connelly) seeking damages and injunctive relief for: (1) false arrest; (2) malicious prosecution; and (3) interference with his business of photography by the alleged acts of defendants.[4] The Secret Service agents protecting Mrs. Onassis' son theretofore had filed a criminal complaint against Galella who was detained and arrested but eventually acquitted.[5] While this acquittal may have ostensibly precipitated the filing of the complaint, we found to the contrary. As we saw it, Galella's motivation was two-fold: "[T]o induce by harassment the payment of money to him by the defendant ... and to obtain an advantage that his action would promote—publicity and its resultant financial rewards."[6]

Mrs. Onassis' answer was filed on March 8, 1971 and included counterclaims seeking relief based on: (1) common law, statutory and the constitutional right of privacy; (2) intentional infliction of emotional distress; (3) assault; (4) harassment; and (5) malicious prosecution. Mrs. Onassis sought injunctive relief, compensatory and punitive

---

1. We bifurcated the issues of liability and damages, and/or other sanctions which may be imposed for contempt; only liability was tried.

2. Local Rules of Procedure for the Southern District of New York (effective October 31, 1980).

3. *Galella v. Onassis*, 353 F.Supp. 196, 199 (S.D. N.Y.1972). Jurisdiction was conferred by 28 U.S.C. 1442(a). *Id.*

4. *Id.; Galella v. Onassis*, 487 F.2d 986, 992 (2d Cir. 1973).

5. *Galella, supra*, 487 F.2d at 992.

6. *Galella, supra*, 353 F.Supp. at 206.

damages aggregating $1.5 million. Reply papers were filed on March 25, 1971.[7]

On July 2, 1971 the late Judge McLean of this Court granted the Government's motion for summary judgment and dismissed Galella's complaint against the three Secret Service agents, holding that the agents were well within the scope of their employment in performing the acts of which Galella complained and were therefore immune from suit.[8] The Government then moved to intervene in the instant action, seeking injunctive relief against Galella for his alleged interference with the protective duties exercised by the Secret Service towards the then minor children of the late President Kennedy and Mrs. Onassis. On July 6, 1971 Judge McLean granted that motion, and on October 20, 1971 the Government's complaint to intervene was filed.[9] On July 7, 1971 we denied the motions by Mrs. Onassis for summary judgment on the complaint and counterclaims.[10]

Sitting in the motion part of this Court on October 8, 1971, we were presented with an order to show cause brought on by Mrs. Onassis seeking a temporary restraining order against Galella. On that day we signed the order in essence preventing Galella from harassing, alarming, blocking the path, or touching the person of Mrs. Onassis and her children.[11] The viability of that order was extended (by our order filed October 28, 1971) following a hearing, by consent of the parties and upon good cause shown.[12]

On December 2, 1971 we were presented with another order to show cause by Mrs. Onassis, prepared by the firm of Paul, Weiss, Rifkind, Wharton & Garrison, substituted counsel for Mrs. Onassis.[13] This proposed order (coupled with another temporary restraining order) sought sanctions

---

7. *Id.* at 199. Mrs. Onassis' damage claims were withdrawn at trial. *Id.* at 199, n.5.

8. *Galella v. Onassis*, Memorandum Decision, No. 70 Civ. 4348 (S.D.N.Y., filed July 2, 1971), *aff'd,* 487 F.2d 986 (2d Cir. 1973).

9. *Galella, supra*, 353 F.Supp. at 199.

10. *Id.* at 200.

11. *Id.* Ordered, that the plaintiff show cause . . . on October 13th, 1971, at 10:00 o'clock in forenoon . . . why a preliminary injunction pursuant to FRCP 65 should not issue herein enjoining the plaintiff, RONALD E. GALELLA, his agents, servants, and employees and all persons in active concert and participation with him pending the final hearing and determination of this action, from harassing, alarming, startling, tormenting, touching the persons of the defendant, Jacqueline Onassis or her children, Caroline B. Kennedy and John F. Kennedy, Jr., and from blocking their movements in the public places and thoroughfares, invading their immediate zone of privacy by means of physical movements, gestures or with photographic equipment, and from performing any act reasonably calculated to place the lives and safety of the defendant, Jacqueline Onassis and her said children, in jeopardy.

It appearing to the court that plaintiff is about to commit the acts hereinafter specified and that he will do so unless restrained by order of this court, and that immediate and irreparable injury, loss or damage will result to defendant before notice can be given and the plaintiff or his attorney can be heard in opposi-

tion to the granting of a temporary restraining order, in that plaintiff, after the expiration of a Consent Restraining Order previously entered herein, has renewed conduct and activities deliberately calculated to cause immediate and irreparable harm to the mental and physical well being of the defendant, Jacqueline Onassis and of her infant children, . . . and defendant having given security approved by the court in the sum of $10,000, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained; it is further

ORDERED, that plaintiff, . . . his agents, servants, employees and all persons in active concert and participation with him be and they hereby are restrained from harassing, alarming, startling, tormenting, touching the persons of the defendant, . . . or her children, . . . and from blocking their movements in the public places and thoroughfares, invading their immediate zone of privacy by means of physical movements, gestures or with photographic equipment, and from performing any act reasonably calculated to place the lives and safety of the defendant, . . . and her said children, in jeopardy . . . .

12. *Id.*

13. *Id.* at 201. Mrs. Onassis, originally represented by McHugh, Heckman, Smith and Leonard, sought an order to show cause on November 3, 1971 why Galella should not be held in contempt of our October 8, 1971 order. However, this motion was withdrawn at trial.

against Galella for his alleged surveillance of Mrs. Onassis and her two children and for contempt of our October 8, 1971 order. We signed the proposed order on December 2, 1971; directed Galella and his agents remain a distance of 100 yards from the Onassis residence in New York City and 50 yards from Mrs. Onassis and her children.[14]

At the same time, we gave the parties an opportunity to change the distance requirements so ordered upon a proper showing. We noted in our earlier opinion:

"We gave the parties opportunity to resettle this order upon adducing proof on the distance requirement: 'Now, make no mistake about this, that if that distance differs from the normal distance for taking a picture in the normal way, I

am ready to change that order accordingly.... If that is excessive, I am ready to change it.' Minutes, January 19, 1972, pp. 31–32...." [15]

No such proof was offered (not even mentioned) before or during the 1972 trial despite this clear opportunity to do so.[16] By our decision of July 5, 1972, permanently enjoining Galella, we directed the parties to settle, on three days notice, the proposed form of the injunction. Both Galella and Mrs. Onassis submitted proposed judgments which were identical in all material respects. Even though Galella again had the clear opportunity to argue that the distance requirements were too harsh or oppressive, he did not do so. The question of modifying the distance requirements of our order was raised for the first time on appeal.[17]

**14.** *Id.* at 201–02. Originally 200 yards and 100 yards were requested.

LET THE PLAINTIFF SHOW CAUSE, in the United States District Court, Room 1505, Foley Square, New York, New York, on December 15, 1971 at 10 A.M., or as soon thereafter as counsel can be heard, why an order should not be entered herein pursuant to Civil Rule 14 of the rules of this Court and 18 U.S.C. § 401(3), adjudging the plaintiff in contempt of this Court for having violated and disregarded the terms of said temporary restraining order, ordering that plaintiff purge himself of said contempt by payment to defendant Jacqueline Onassis of the sum of $10,000, together with all the costs of this proceeding, including attorneys fees, and restraining the plaintiff, Ronald E. Galella, his agents, servants, employees and all persons in active concert and participation with him from photographing the defendant, Jacqueline Onassis, or her children, Caroline B. Kennedy and John F. Kennedy, Jr., from keeping the defendant or her children under surveillance or following them, from approaching within a distance of 200 yards of the apartment building at 1040 Fifth Avenue, New York, New York, from knowingly being physically within 100 yards of the persons of defendant Jacqueline Onassis and her infant children, Caroline B. Kennedy and John F. Kennedy, Jr., or any of them, or from communicating or attempting to communicate with any of them in any fashion.

It appearing to the Court that plaintiff is about to commit the acts hereinafter specified and that he will do so unless restrained by order of this Court and that immediate and irreparable injury, loss or damage will result to defendant before notice can be given and the plaintiff or his attorney can be heard in opposition to the granting of a temporary restraining order, in that plaintiff, in spite of the temporary restraining order entered herein on October 8,

1971 and extended by order dated October 28, 1971, has renewed conduct and activities causing immediate and irreparable harm to the mental and physical well being of the defendant, Jacqueline Onassis, and her infant children, Caroline B. Kennedy and John F. Kennedy, Jr., and defendant having previously given security approved by the Court in the sum of $10,000, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained; it is further

ORDERED, that plaintiff, Ronald E. Galella, his agents, servants, employees and all persons in active concert and participation with him be and they hereby are restrained from keeping the defendant or her children under surveillance or following them, from approaching within a distance of 100 yards of the apartment building at 1040 Fifth Avenue, New York, New York, from knowingly being physically within 50 yards of the persons of defendant Jacqueline Onassis and her infant children, Caroline B. Kennedy and John F. Kennedy, Jr., or any of them, or from communicating or attempting to communicate with any of them in any fashion. This order remains in full force and effect until the final resolution of the within application (the parties consenting thereto).

**15.** *Galella, supra,* 353 F.Supp. at 201, n.9. *See also Galella, supra,* 487 F.2d at 1000, 1002–03 (Timbers, J. concurring in part and dissenting in part).

**16.** *Galella,, supra,* 353 F.Supp. at 201, n.9.

**17.** *Id.* at 241. *Galella, supra,* 487 F.2d at 1002–03 (Timbers, J. concurring in part and dissenting in part).

Continuing chronologically: On January 19, 1972, Alexander Julien, Esq., Galella's trial counsel,[18] requested an off the record discussion in the robing room with counsel for Mrs. Onassis present.[19] During this discussion Julien stated that he intended to move for our recusal; that having been nominated by the late President Kennedy we could not render an unbiased judgment. We advised Julien that if he intended to bring on such a motion, he should do so promptly because a trial date would be set shortly. Mr. Julien stated that he would confer with his client, and if Galella decided to proceed, the appropriate and procedurally proper application would be made. Galella never made such an application.[20] We again hasten to add that despite the very simple procedure to properly move for recusal,[21] Mr. Julien instead opted for the particularly offensive procedure of denouncing us in open court.[22] He resorted to the same tactic in his brief on appeal from our order entered in 1972—all to no avail as came to light when our Circuit Court handed down its disposition of the appeal finding correct our refusal to grant the motion to recuse:

> The court's refusal to recuse himself was correct. See *United States ex rel. Brown v. Smith*, 200 F.Supp. 885, 930 (D.Vt.1961), rev'd on other grounds, 306 F.2d 596 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963); *United States v. Sclafani and Ross*, 487 F.2d 245 at 255 (2d Cir. 1973). A judge may be disqualified for bias only on motion supported by a written affidavit of facts supporting the claim of bias and a certificate of good faith from the

counsel of record. 28 U.S.C. § 144. Galella failed to comply with the statute; no showing was made of a legal basis for the claim, no motion was made nor affidavit filed. Informal requests to the court, or failure to comply with the statute because of an expectation of denial, however well founded, cannot be substituted for compliance with § 144.

He now again presses the same grounds for our recusal.

On January 25, 1972 we notified counsel that the trial would begin on February 14, 1972. We also suggested to them that the trial of the main action and the proceedings on the preliminary injunction be consolidated—Galella had indicated that he desired such a consolidation.[23] On that same day (January 25, 1972) counsel for Galella filed a jury demand for the upcoming trial. We then noted that despite the simple procedure therefor, the jury demand was over nine months late, and that we had no alternative but to strike it.[24]

On February 2, 1972 we denied Galella's motion to remand the action for want of jurisdiction, stating that "already considerable expenditure of federal judicial time [has been spent] in an action which was properly removed...."[25] On February 3, 1972, pursuant to Fed.R.Civ.P. 65(a)(2), we ordered the consolidation of the main action with the proceedings for a preliminary injunction. At the request of Galella, we adjourned the hearing date to February 16, 1972.[26]

The proceeding spanned one month, February 16 to March 23, 1972; the hearing

---

**18.** Alexander Julien, a member of the firm of Julien, Glazer, Blitz & Schlesinger entered the proceedings as trial counsel for Galella on December 10, 1971. Bennett Brown, Esq., was Galella's attorney of record throughout the original proceedings. *Galella, supra*, 353 F.Supp. at 202.

**19.** *Id.* at 203. Our law clerks were also present at this meeting.

**20.** *Id.*

**21.** During 1971–72, 28 U.S.C. § 144 was the controlling statute for recusal. This section states in part that a "timely and sufficient affi-

davit [stating] the facts and the reasons for the belief that bias or prejudice exists" be filed along with a "certificate of counsel of record stating that it is made in good faith." 28 U.S.C. § 144.

**22.** *Galella, supra*, 353 F.Supp. at 239–40.

**23.** *Id.* at 202.

**24.** *Id.*

**25.** *Id.*

**26.** *Id.*

record consisted of 4,714 pages of testimony from twenty-five (25) witnesses, and hundreds of exhibits.

Our decision issued on July 5, 1972. We dismissed Galella's complaint in all respects and granted injunctive relief to Mrs. Onassis and her children. Galella was enjoined from approaching within 100 yards of the home of Mrs. Onassis and her children; 100 yards from the children's school; and at all other places 50 yards from Mrs. Onassis and 75 yards from the children. Further, Galella was enjoined from surveilling Mrs. Onassis and her children and from communicating or attempting to communicate with them.[27]

By this decision and our order entered on July 19, 1972 we held Galella in civil contempt, committed three (3) separate times, for: (1) "willfully and knowingly harassing defendant and her children in violation . . . of our . . . order dated October 8, 1971"; (2) "willfully and knowingly violating the provisions relating to surveillance and distances set out in our . . . order of December 2, 1971"; and (3) "willfully and knowingly failing to produce photographic matter called for in the deposition subpoena."[28] We also ordered "that defendant Jacqueline Onassis shall recover from plaintiff Ronald E. Galella a fine for each of plaintiff's . . . acts of civil contempt, the amount of said fine to include compensatory damages, including counsel fees, in an amount to be fixed by this Court at a later date."[29]

Mrs. Onassis never pursued these monetary remedies. Apparently, she experienced difficulty in collecting on a judgment for daily transcript costs in 1972, and therefore had reason to believe that Galella was judgment-proof at that time. Further, her attorneys believed that the costs of any further proceedings would probably exceed any monies that, in reality, could be collected from Galella; and they found it impossible to fairly allocate attorney's fees for the hearing on the contempt motions and the trial of the main action since both were held contemporaneously.[30]

Galella appealed our decision arguing that the First Amendment established an absolute immunity from any liability while he gathered news; that we were in error for: (1) refusing to remand the case; (2) refusing to allow a jury trial despite his untimely request; (3) excluding him from Mrs. Onassis' deposition; (4) refusing to recuse ourself; and (5) consolidating the trial on the merits with the temporary injunctive proceeding.[31]

Our Circuit Court rejected all of Galella's challenges mentioned above. Referring to our determination that Galella's testimony at trial was utterly corrupt and that we discredited all his testimony, our Circuit Court reinforced emphatically its own estimate of Galella's credibility:

> The court's findings on credibility are indeed broad, but they are supported in the record. Galella demonstrated a galling lack of respect for the truth and gave no indication of any consciousness of the meaning of the oath he had taken. Not only did he admit blatantly lying in his testimony, he admitted attempting to have other witnesses lie for him.[32]

Bearing in mind this strong condemnation, it is quite evident to us that Galella was, and still is, indifferent to the circumstance that he was not held to account in criminal proceedings.

Galella also argued on that appeal that he was deprived of a fair and impartial trial because of our bias and hostility towards him and his counsel in sharp contrast to our

27. *Id.* at 241.

28. *Id.*

29. *Galella v. Onassis,* Order, filed July 19, 1972.

30. Post-Hearing Memorandum in Support of Motion for an Order of Civil Contempt, dated January 7, 1982 (Memorandum in Support) p. 61.

31. *Galella, supra,* 487 F.2d at 995–96. Galella also raised numerous claims of error regarding our evidentiary rulings. The Circuit Court of Appeals affirmed our rulings in all respects. *Id.* at 996.

32. *Id.* at 994, n.10.

attitude favorable to Mrs. Onassis and the Government.[33] Going to extraordinary lengths in his brief on appeal from our 1972 order, Mr. Julien saw fit to angrily denounce as an "extraordinary farewell address"[34] our expression of thanks to all counsel except Mr. Julien.

On appeal all of these allegations of bias were rejected. The Circuit Court cited two cases[35] which substantively teach that a judge need not recuse himself on the basis of what he learns while performing his judicial duties; only those things emanating from an extra-judicial source can form a basis for recusal. In spirit and to the letter, we meticulously adhered to the clear prohibition mandated by law. More on the "bias" issue later in this opinion.

Further, the Circuit Court held that Galella failed to submit the necessary affidavits supporting his claim of bias, and had therefore failed to comply with the statutory prerequisites.[36]

Our Circuit Court of Appeals modified (by a 2 to 1 vote) the distance requirements which we had established, stating, "[t]he injunction, however, is broader than is required to protect the defendant ... [the injunction] should not unnecessarily infringe on reasonable efforts to 'cover' defendant."[37] Our order was modified (by our subsequent order of January 8, 1975) to prohibit:[38]

(1) any approach within twenty-five (25) feet of defendant or any touching of the person of the defendant Jacqueline Onassis; (2) any blocking of her movement in public places and thoroughfares; (3) any act foreseeably or reasonably calculated to place the life and safety of defendant in jeopardy; and (4) any conduct which would reasonably be foreseen to harass, alarm or frighten the defendant.

As to the protection for the children of Mrs. Onassis, Galella was prohibited from:[39]

(a) entering the children's schools or play areas; (b) engaging in action calculated or reasonably foreseen to place the children's safety or well being in jeopardy, or which would threaten or create physical injury; (c) taking any action which could reasonably be foreseen to harass, alarm, or frighten the children; and (d) from approaching within thirty (30) feet of the children.

Our Circuit Court upheld every disposition announced in our order of July 19, 1972 except as to the distances provided therein. It must be borne in mind that the order to show cause which brought on our order of July 19, 1972 requested certain distances be announced in that order. To that end, we adopted the suggested distances contained in the order to show cause. We consider it vital, however, to emphasize that before we signed our order of July 19, 1972, we afforded counsel an opportunity to suggest other distances:

"Now, make no mistake about this, that if that distance differs from the normal distance for taking a picture in the normal way, I am ready to change that order accordingly.... If that is excessive, I am ready to change it."[40]

Our solicitude was to no avail, for no request was ever made.

As to distances: distance from Mrs. Onassis: our order fifty (50) yards; the majority of our Circuit Court twenty-five (25) feet; the concurring—dissenting opin-

---

**33.** Galella's Brief on Appeal, p. 61.

**34.** *Id.* at 65–66.

**35.** *United States ex rel. Brown v. Smith*, 200 F.2d 885 (D.Vt.1961), *rev'd on other grounds*, 306 F.2d 596 (2d Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963); *United States v. Sclafani and Ross*, 487 F.2d 245 (2d Cir. 1973).

**36.** *Galella, supra*, 487 F.2d at 997.

**37.** *Id.* at 998.

**38.** *Id.* The Circuit Court also struck that portion of our order which prohibited Galella "from appropriating defendant's photograph for advertising or trade purposes without defendant's consent...." *Galella, supra*, 353 F.Supp. at 241; *Galella, supra*, 487 F.2d at 998.

**39.** *Galella, supra*, 487 F.2d at 999.

**40.** Minutes, January 19, 1972, pp. 31–32.

ion of Judge Timbers fifty (50) yards. The distance from her home: our order one hundred (100) yards; the majority of the Circuit Court: no restriction; Judge Timbers: 100 yards. Distance from the children: our order seventy-five (75) yards; the majority of our Circuit Court thirty (30) feet; Judge Timbers seventy-five (75) yards. Distance from their school: our order one hundred (100) yards; the majority of our Circuit Court: restricted from entry to school or play areas; Judge Timbers 100 yards.

After the Circuit Court's decision was rendered, Mrs. Onassis unsuccessfully petitioned that Court for a rehearing and a rehearing en banc.[41]

On January 8, 1975, on remand from the Circuit Court, our judgment permanently enjoining Galella was entered. It is this order which, in the instant proceeding, Galella is charged with having violated. It reads:

> ORDERED, ADJUDGED AND DECREED that:
>
> 1. The complaint herein be, and the same hereby is, dismissed on the merits as to all defendants;
>
> 2. The plaintiff's motions to dismiss the complaint of the Intervenor United States of America be, and the same hereby are, denied;
>
> 3. The plaintiff's motions to dismiss the counterclaim be, and the same hereby are, denied;
>
> 4. The plaintiff, Ronald E. Galella, his agents, servants, employees and all persons in active concert and participation with him be, and they hereby are, permanently enjoined and restrained from directly or indirectly:
>
> (i) approaching within a distance of 25 feet of the person of defendant Jacqueline Onassis;
>
> (ii) touching the person of defendant Jacqueline Onassis;
>
> (iii) any blocking of the movement of the person of defendant Jacqueline Onassis in public places or thoroughfares;
>
> (iv) performing any act foreseeably or reasonably calculated to place the life or safety of defendant Jacqueline Onassis in jeopardy;
>
> (v) engaging in any conduct which would reasonably be foreseen to harass, alarm or frighten defendant Jacqueline Onassis;
>
> (vi) entering a school or play area of Caroline B. Kennedy or John F. Kennedy, Jr.;
>
> (vii) engaging in any action calculated or reasonably to be foreseen to place the safety or well-being of Caroline B. Kennedy or John F. Kennedy, Jr. in jeopardy, or which would frighten or create physical injury to either of them;
>
> (viii) taking any action which could reasonably be foreseen to harass, alarm or frighten Caroline B. Kennedy or John F. Kennedy, Jr.;
>
> (ix) approaching within 30 feet of the persons of Caroline B. Kennedy and John F. Kennedy, Jr., or either of them;
>
> (x) taking any action, including those described in paragraphs (vi), (vii) and (viii) above, interfering with the protective duties of United States Secret Service agents with respect to John F. Kennedy, Jr.
>
> 5. Defendant Jacqueline Onassis and Intervenor United States of America recover from the plaintiff their costs and disbursements, as modified by the Court of Appeals.
>
> Being that defendant Onassis "has no opposition" to the entry of this judgment (letter to the Court dated December 18, 1974), it is further
>
> ORDERED that the Clerk is directed to make entry of this final judgment in accordance with Rule 58, Federal Rules of Civil Procedure.

It must be emphasized that no appeal from this order was taken.

\* \* \* \*

---

**41.** *Galella, supra,* 487 F.2d at 1004–06.

On November 13, 1981 movants filed, pursuant to Rule 44 of the Civil Rules of this Court, the instant motion to hold Galella in contempt of our January 8, 1975 order. Mrs. Onassis recites three instances of Galella's contemptuous behavior; Ms. Kennedy presses one. By their current attorneys, Milbank, Tweed, Hadley & McCloy, Mrs. Onassis and Ms. Kennedy seek compensatory damages, coercive fines and imprisonment, Court initiated criminal contempt proceedings, and attorneys fees.[42]

On December 11, 1981 Galella filed a "Notice of Cross-Motion for Recusal Pursuant to 28 U.S.C. § 144, § 455 and Rule 3 of the Civil Rules of this Court." As already noted hereinabove, the reasons set forth for our recusal offered nothing new. As part of Galella's appeal from our order of July 5, 1972, each of these precise issues were raised in overwhelming detail, considered by the Circuit Court, and rejected.[43] We again denied the motion for recusal.[44] On December 15, 1981, at the commencement of the contempt hearing and before any proof was received, we announced our decision regarding recusal and stated that Galella's allegations of personal bias alleged facts covered in the previous judicial proceedings, also our expression of opinion of those assertions—facts, which alone, can not form the basis of recusal.[45] We concluded: [46] "The instant applications by Mr. Galella which seek recusal are procedurally defective [47] and devoid of substance. The papers before us are barren of personal bias or prejudice. Why? Because none in fact exists. It goes without saying, to use the vernacular, 'we shall call them as we see them, as they come across the plate.'"

On December 11, 1981 Galella filed an affidavit in opposition to the contempt motion and also filed a cross motion for the appointment of a special master, in the event we denied the motion for recusal; leave to depose witnesses; and permission for Marvin M. Mitchelson, Esq., to appear as trial counsel.

In his affidavit Galella stated, "I hereby deny that any conduct alleged of me in the moving papers constituted any contempt in violation of this Court's judgment entered January 8, 1975 ... I have not acted any differently than other fellow photographers." [48] The affidavit recounted the alleged instances of contemptuous behavior and, in essence, constituted a general denial; it further stated that he had no intention of violating the spirit of our order.[49]

Galella also asked that he "... be given the chance to testify, to adduce evidence on my own behalf, and to confront those who would seek to inflict penalty on me." [50] This was the first mention by Galella that he sought a hearing in the matter.

The hearing of the contempt motion commenced on December 15, 1981. Mr. Mitchelson was admitted *pro hac vice* as Galella's counsel for purposes of this hearing.[51]

In support of a demand for a jury trial, Galella's counsel argued that pursuant to Rule 44(b) of the Local Rules of this Court, Galella was entitled to a jury trial; that in

---

42. Affidavit, Edward J. Reilly, Esq., verified November 5, 1981 (Reilly Affidavit) pp. 3–4. Memorandum in Support, pp. 19–25. The firm of Milbank, Tweed, Hadley & McCloy was substituted as movants' counsel on November 9, 1981. *Galella v. Onassis*, Order of Substitution, filed November 9, 1981.

43. See Galella's Brief on Appeal, pp. 61–67; Onassis' Brief on Appeal, pp. 54–67; Galella's Reply Brief on Appeal, pp. 33–42; *Galella, supra*, 487 F.2d at 997.

44. H.T. 2–14. ("H.T." refers to the transcript of the hearing held on December 15 and 16, 1981).

45. H.T. 6–7.

46. H.T. 12–13.

47. Galella's motion was also procedurally defective (as was his earlier 1972 motion) in that it was not served within the necessary ten days before the return date as required by Rules 3(b) and 3(c)(2) of the Civil Rules of this Court.

48. Affidavit, Ronald E. Galella, verified December 11, 1981 (Galella Affidavit) p. 2.

49. Galella Affidavit, p. 8.

50. *Id.* at 9.

51. H.T. 15–16.

the event this was denied, we should empanel an advisory jury.[52] We were constrained again to deny these requests.[53] Likewise, Galella's earlier applications for appointment of a special master and leave to take depositions were denied.[54]

Galella's actions between 1975–1981

The instant motion to hold Galella in contempt is our first involvement in this matter since our order of January 8, 1975— over six and a half years ago. As already pointed out hereinabove (p. 1077) no application was brought by Mrs. Onassis and/or her children during that time to hold Galella in contempt. In support of the instant application, the affidavit of Mrs. Onassis recites: "I am particularly fearful, because Galella, after some respite, is again engaging in the same kind of unlawful surveillance and threatening behavior . . . which I understood was specifically prohibited by the January 8, 1975 order of this Court." [55]

During that period of six and a half years, there had been considerable deportment by Galella which offended the prohibitions of our order of January 8, 1975. She testified on cross examination: [56]

Q. Now, as a matter of fact, in the last six years Mr. Galella has photographed you on numerous occasions, hasn't he?

A. Yes.

Q. Now, on any of those occasions in 1975, 1976, 1977, 1978, 1980 and through May of 1981, did you register to any law firm at all any place in the world, ask them to bring a contempt violation against Mr. Galella?

A. I registered to Mr. Alexander Forger of Milbank, Tweed on numerous occasions the fact that Galella was pursuing me and my children, that he ruined my son's graduation at Andover, that he ruined my daughter's graduation at Harvard, that he bribed his way into the

Hyannisport private dock at Hyannisport, that he made it impossible for one to leave the—. . . That where I lived in Hyannisport, it is impossible to get to the water or to get to the dock without being visible to a photographer. Galella got someone in the town to give him a pass so he was on the pier. He would photograph you there. He made it so the only place that you could stay was inside a small, what is called the compound. If you wanted to get out in the evening to run on the golf course, the one minute of the day, he was up there once. All those times. The public—on public occasions he would often come very close to me and I said to him, 'Watch out. You're coming too close to me. I'm going to take you to court.' He would laugh and jeer. Sometimes he'd knock people down. But all of those things I thought. All right, when I go out to a public place, there are going to be other photographers there, and I'm with someone I can hang onto, that's fine. I thought my son will only graduate from school once, my daughter from college once, so those things I could take. Hyannis began the happiest time of the year this summer, began to be gradually intolerable, and eventually I thought that it's almost not livable here any more with this surveillance. And each time of those times when I was very upset, I would convey my upsetness to [Milbank, Tweed].

. . .

I told [Milbank, Tweed] that Galella's pursuit of me over the earlier years—in not exactly these words, but this was the gist of it—had been sporadic, it wasn't the relentless pursuit it used to be, but now it looked like it was going to be unrelenting again.

. . .

---

**52.** H.T. 33–36. *Galella v. Onassis*, Jury Demand on Behalf of Ronald E. Galella, filed December 15, 1981.

**53.** H.T. 36.

**54.** H.T. 32.

**55.** Affidavit, Jacqueline Onassis, verified November 5, 1981 (Onassis Affidavit) ¶ 2.

**56.** H.T. 289–91, 299; 379–80.

Q. ... Mrs. Onassis, will you tell us now, how long of a respite was there? About five or six years...?

A. Galella photographed me intermittently in those years. There was never a total cessation of his photographing me.... Several times each winter at public functions Galella is always there. He practically always gets closer to me than 25 feet. The two graduations of my children.

Mrs. Onassis, again on cross-examination, offered a convincing reason as to why she had not initiated Court proceedings any earlier: [57]

Q. ... Between 1975, after the relentless pursuit had died down, and let's say the beginning of this year, whatever Galella had done by way of photographing you, had not been so harassing to you that you saw fit to try to bring him into the courtroom for contempt, had it?

A. It had been harassing each time, but the ordeal of going to court was something I kept putting off because I thought I could take this, I could take that when I go out to the theatre or a child's graduation. But when it became relentless again, then I had no recourse but to go to court.

Mrs. Onassis dispelled any suggestion that she was motivated to initiate the instant proceedings for any reason other than Galella's own behavior: [58]

Q. Mrs. Onassis, do you object to Mr. Galella photographing you under any circumstances?

A When he comes really close and bumps in and makes me—and makes other people back around and stare at me, yes, I do.

.    .    .

THE COURT: But if he doesn't get close to you, if he doesn't come within the prohibition of the order, do you object to his taking photographs of you?

.    .    .

THE WITNESS: No, your Honor.

### Eighth Avenue

The first incident complained of by Mrs. Onassis occurred on July 21, 1981 when she attended a mid-day performance of the film "Death in Venice" at the Hollywood Twin Theatre on Eighth Avenue near 47th Street in New York City.[59] The following constitutes the totality of the clear and convincing proof of this episode.

During that performance, the manager of the theatre "tipped off" the New York Post as to the presence of Mrs. Onassis in the theatre. Galella testified: [60] "I got a call that day from David McGough, and he said that ... he got a tip from the Post to cover this Hollywood Twin Theatre because Jackie—the manager called the Post and told them, tipped them. David McGough and myself are friends, and we do exchange information."

The incident began as Galella confronted Mrs. Onassis as she attempted to exit the theatre; the manager held her in the doorway (handing her a business card) so that Galella could take their pictures together. Mrs. Onassis testified: [61] "... [H]e tried to hold me in the doorway so Galella could take his picture of me.... I was confused. I wanted to get out of that place. I didn't like the man holding me in the door, giving me his card, while Galella could take a picture of it. I wanted to get out of there...."

Having managed to get past this initial encounter, Mrs. Onassis then proceeded out of the theatre onto the sidewalk. She testified as to what Galella did next.[62] "When I came out of the theatre, Galella was blocking my path.... He was several feet away.... He was taking pictures ... and

---

**57.** H.T. 301–02.

**58.** H.T. 314–16.

**59.** Onassis Affidavit, ¶¶ 3, 4; *See also* H.T. 501.

**60.** H.T. 527; *See also* H.T. 501–03.

**61.** H.T. 390–91.

**62.** H.T. 250–53.

leaping around with some other photographers... He blocked [63]—I couldn't get a—I wanted to get away from those people quickly and get a taxi, but he stood in front of me so I couldn't. . . . I said to [Galella], 'Don't get that close to me. I'll take you to court.' He said, 'Oh, you will take me into court, will you, Jackie?'"

Galella was also ". . . making those scary, grunting noises . . ."—a ". . . very rapid low noise like an animal. . . ." [64]

At this point, Mrs. Onassis became quite alarmed and fearful: [65] "I was startled and frightened to see photographers when I emerged from the theatre, and confused. . . . I was harassed, surprised; it was unexpected. I had gone to the theatre just quietly during lunch hour, and came out and saw photographers leaping around. That was what Galella used to do in the old days. And here it was starting again. . . . I feel that when you're coming out of a dark theatre into the light and you are rushed by some photographers, one of them being Mr. Galella, yes, I object to that. It's unsettling."

Galella pursued Mrs. Onassis into the middle of Eighth Avenue where she attempted to hail a cab. She testified: [66] "I tried to hail a taxi, where I was then in the middle of Eighth Avenue, with traffic all around. . . . [Galella] was jumping all around me, in front and in back, and very close at times, so no taxi could see me. Everytime I raised my arm, he'd be in front of me." [67] Finally she succeeded in hailing a cab. However, the first cab she hailed apparently overheated. [68] Plaintiff's exhibit 14, [69] a photograph taken by David McGough which depicts this phase of the incident, clearly shows Galella within a very few feet of Mrs. Onassis. Mrs. Onassis estimated the distance to be two feet. [70] When confronted on direct examination with this convincing piece of evidence Galella testified as follows: [71]

Q. You're clearly within 25 feet of her there, aren't you, sir?

A. No.

Q. Within 25 feet, you're clearly within—

A. Oh, yes, I'm closer than 25 feet.

Q. How much away would you say you were?

A. *Five or six feet.* (emphasis ours)

On cross-examination, Galella testified: [72]

Q Mr. Galella, I show you Defendant's Exhibit A, a photograph of you—

A Yes.

Q —behind Mrs. Onassis.

A Yes.

Q You testified on direct examination you were how close to her on that occasion?

A Five to six feet away.

Q Five to six feet away?

A Yes, sir.

Q And you were trying to get around, in front of her; is that correct?

A Yes.

---

**63.** The term "blocked," as used by Mrs. Onassis here was clarified at the hearing, notwithstanding the fact that it did not appear in her affidavit in support of her instant application: "Jumping, referring to blocking because jumping is changing positions. Sometimes you're to the side of the person; sometimes in front of them. When he was in front of me, jumping, he was blocking my . . . passage." H.T. 339.

**64.** Onassis Affidavit, ¶ 3; H.T. 344.

**65.** H.T. 333–34.

**66.** H.T. 253; *See also* Plaintiff's Exhs. 11, 12.

**67.** David McGough, Galella's friend and fellow photo-journalist present at this incident made it clear that at that particular time Eighth Avenue was quite busy: ". . . This is a busy street.

This is Eighth Avenue. It was very busy, a lot of cars coming by, and there's an intersection up this way on the street." H.T. 456.

**68.** Plaintiff's Exh. 14.

**69.** The "cropped" version of plaintiff's exhibit 14, defendant's exhibit A, appeared the very next day (July 22nd) in the New York Post and again on September 24, 1981. Onassis Affidavit, Exhs. A, B; *See also* H.T. 354.

**70.** H.T. 355.

**71.** H.T. 504.

**72.** H.T. 538–42.

Q   Are you telling the Court, Mr. Galella, that that was the best of your ability, you couldn't stay 25 feet away from Mrs. Onassis on that occasion, that you had to get within five to six feet—

A   I can't do my job—

THE COURT:  . . . Come on, what's your answer, Mr. Galella?

A   I can't carry a tape measure with me.

THE COURT:  Please.

THE WITNESS:  We are both moving. Mrs. Onassis us [sic] a moving subject and I'm a moving person myself.

THE COURT:  He asked you a question.  Do you want to overrule the Judge, too?

THE WITNESS:  No.

THE COURT:  Then stop.  Just answer a simple question.

A   *Yes, I'm five or six feet away from her.*  To do my—

THE COURT:  There it is. . . .

Q   Well, isn't it fair to say that if it's necessary for you to get within 25 feet of Mrs. Onassis, in order to do your job, you will thumb your nose at the order of the Court?

A   No, I'm not thumbing my nose at the order of the Court.

Q   But you're not complying with the order of the Court, are you?

A   Not fully, because—

.    .    .

Q   I'm asking you whether you are violating an order of a United States District Court.  Are you?. . .

A   When I do my job, that is, taking pictures, I concentrate on my subject. And, yes, *I sometimes break that order of 25 feet.*  (emphasis ours)

By this time Mrs. Onassis had become thoroughly upset and frightened by the totality of Galella's behavior:[73] " . . . I was frightened, confused; I was frightened on two accounts.  One was being hit by a car coming from one direction or another; the other was a lot of rather weird people were

coming out of the buildings along Eighth Avenue and 44th Street, and they were all pointing, yelling, 'Oh, look, it's Jackie .O. Hey, Jackie,' and some of them were coming up to me.  I was beginning to be rather sort of teased or followed by them.  And so my reactions were confusion and fright and desperation."

This incident ended when Mrs. Onassis hailed a second cab and left the scene.

*        *        *        *

Galella argues that he was doing no more than his fellow photo-journalists by taking Mrs. Onassis' photograph; that he did not intend to violate this Court's order of January 8, 1975;  and that movant has failed to sustain her burden of proof.  For her part, movant maintains that the total proof on the theatre incident clearly and convincingly indicates that Galella violated several provisions of our order of January 8, 1975.

We are compelled to note *in limine* that the vast majority of respondent's factual arguments on this episode are barren by inference or otherwise—nothing more than trivial strawmen—unconvincing in their nature and insignificant in their impact on movant's overwhelmingly persuasive proof on this score.

Most assuredly, Galella is not, nor can he, consider himself just another photo-journalist when the photographic subject is Mrs. Onassis.  His actions on that occasion are saturated with flagrant violations of our order.

Galella violated section 4(i) of our order throughout the totality of this incident: When Mrs. Onassis left the theatre, Galella was within twenty-five feet of her;  when she made her way onto Eighth Avenue to hail a cab, Galella remained within twenty-five feet of her;  and when she exited the first taxi cab she had hailed, Galella was again within twenty-five feet of her.  Galella himself admitted that he came within five to six feet of Mrs. Onassis during this incident.

The same result obtains when we consider section 4(iii) of our order:  Galella

73.  H.T. 254.

blocked the movement of Mrs. Onassis when she left the theatre; and again when she first made efforts to hail a cab on Eighth Avenue. It is no answer to say that Mrs. Onassis could have and in fact did choose another path on which to proceed. The assumption upon which that argument is based necessarily forces an adverse conclusion: Galella blocked the movement of Mrs. Onassis.

Finally, section 4(v) of our order has been violated: The proof is conclusive that Galella's conduct harassed, alarmed and frightened Mrs. Onassis. His aggressive pursuit of movant frightened, harassed and alarmed her. Galella was not content with taking pictures of Mrs. Onassis on the sidewalk; he pursued her onto the street itself where he continued to jump around her on this admittedly busy Manhattan thoroughfare. Understandably, Mrs. Onassis, as would anyone, became alarmed and frightened for her safety.

This is not a situation where a coincidental meeting occurred. Rather, Galella intentionally went to this theatre; his jumping and leaping, combined with his "making those scary grunting noises . . . very rapid low noise like an animal," produced the only foreseeable conclusion. His arrogant persistency, compounded by each step he took, only added to the harassment, alarm and fear clearly instilled in his subject well before the incident was over.

As to Galella's argument that he did not intentionally violate our order, we remain positively convinced to the contrary. The solid proof adduced on this event is overwhelming—even beyond a reasonable doubt.

### Menemsha Pond

The next incident complained of by Mrs. Onassis occurred on September 6, 1981 at 2:20 P.M. while she and a friend were attempting to board her boat on Menemsha Pond located in Martha's Vineyard.[74] The following constitutes the clear and convincing evidence of that event.

This encounter with Galella, as with the Eighth Avenue incident, was the result of a premeditated plan by Galella designed to seek out Mrs. Onassis and/or her children as photographic subjects.

Galella recounted at the hearing how he came to be on Menemsha Pond that day:[75] "Well, that day we met with Paul Adao, and my wife, myself and Paul [Adao] went to Falmouth where he arranged this fishing boat that we were going to go sailing toward Martha's Vineyard. When we got to Martha's Vineyard, we entered Menemsha Pond, looking for Mrs. Onassis or her children water skiing."

Paul Adao, one of Galella's fellow photojournalists who was present during the entire incident testified:[76] "I had rented a 29-foot fishing boat to take pictures presumably of Caroline Kennedy, Mrs. Onassis or John Kennedy water skiing on the pond or in the surrounding waters around Martha's Vineyard."

Mrs. Galella called to the stand testified on cross-examination:[77]

Q My question is: Isn't it a fact that you went to Menemsha Pond on Labor Day for the primary purpose of photographing Mrs. Onassis and her children?
A Yes.

Arriving in the vicinity of Menemsha Pond, these three photographers almost immediately spotted one of their targets. Adao testified:[78] "Well, we first observed her walking down a path, okay, from where she had parked her car, okay, I believe. . . . She walked down the path. We were probably three, four, five hundred feet away, I'm not exactly sure. It was quite some distance. I was viewing her with a pair of binoculars that I had."

**74.** Plaintiff's Exh. 20; Onassis Affidavit, ¶ 5; H.T. 254.

**75.** H.T. 509; *Compare* Galella Affidavit, p. 4.

**76.** H.T. 482. The boat came equipped with a driver and the total cost of the rental was shared equally among the three photographers. H.T. 543.

**77.** H.T. 577.

**78.** H.T. 483.

Galella's testimony also added to the details of this initial stage of the confrontation:[79] "[T]hen [we] spotted Mrs. Onassis and a companion friend, ... entering a small rowboat. They rowed the boat toward the moored boat, the motor boat. That's when we commenced shooting pictures from our fishing boat, all of us, the three of us. The distance varied from approximately 100 feet, and then we got closer .... We took several pictures. It was a good opportunity to take pictures because they were in a slow rowboat...."

As Galella's boat approached, Mrs. Onassis became frightened:[80] "We rowed out from the shore of Menemsha Pond in a dinghy to my boat, which is a sort of fishing boat with an outboard engine on the back. We were trying to board it. We saw this smaller motorboat with a roof, further away, with people. They came by. As they saw us trying to board from the dinghy to the big boat, they came zooming by, making a wake, frightening us...."

Mrs. Onassis testified on direct examination that at this point Galella was about fifteen feet from her.[81] When pressed on cross-examination, Mrs. Onassis buttressed her earlier testimony regarding this distance, in convincing fashion:[82] "... Mr. Galella was as close to me as—say he was eight inches or a foot behind the stern of the boat. My boat isn't as wide as this table. So if I said the boats were 15 feet apart, if you add another foot or 18 inches for boat material, then he would have been 16½ feet away from me...."

Q ... [W]hen you say the boat came close, is that the estimate that you made about the 15 feet and possibly another couple of feet; right?

A Yes, it is.

Q And it is a rough estimate, isn't it?

A Yes, it is.

Q It could have been as far as 25 feet in that particular instance, couldn't it, Mrs. Onassis? It could have couldn't it?

A But it wasn't.

We reject as unconvincing and self-serving the estimate of Galella, his wife and Adao that the closest they ever came to Mrs. Onassis was fifty feet.[83]

As a result of the proximity of Galella's boat, Mrs. Onassis could not immediately leave the scene. Galella and his party continued to take pictures.[84] She testified: "The engine of our boat stalled. We couldn't start it. I recognized one of [the photographers] as Galella. Then they went further away. He was in the middle. There [was] a person on each side of him.... Then finally, we did get our boat started. We had to pass by Galella's boat to get out the rather narrow part of the pond into the wider part leading into the sea. Then I was trying to duck down, and, you know, Galella was photographing me. I try not to look when—I don't want to give him his pictures that will then just carry the whole thing and make him sell more, so I was trying to duck down."[85]

On cross-examination, Mrs. Onassis convincingly testified as to the relative positions of the two boats as well as the blocking movements of Galella's:[86]

Q I know you described how your boat stalled. Aside from the boat stalling, you don't contend that Galella in his

79. H.T. 509; See, e.g., Plaintiff's Exhs. 15, 17.

80. H.T. 254–55; See also Onassis Affidavit, ¶¶ 6-7.

81. H.T. 255.

82. H.T. 361–62; 367.

83. H.T. 510; 571; 484.

84. See, e.g., Plaintiff's Exh. 18.

85. H.T. 255. Galella's unconvincing account on this phase of the incident was only that "...

they had a little trouble starting the engine...." H.T. 509.

86. H.T. 357–58. Photographs taken by Galella during this incident appeared in the September 21, 1981 edition of Newsweek; the October 2, 1981 edition of Paris Match; and the October 1, 1981 edition of Eva Express. See H.T. 260; Onassis Affidavit, ¶ 17. Some of the photographs also appeared in the German publication, Bunte Illustrated; Japanese magazines; and others. H.T. 549.

boat ... was trying to block you from moving about the lake ... do you? You contend that, do you?

A He was endangering me by being there. I had no idea what he was going to do next—block me, pursue me. He was making big waves of water that were making our boat stall.

Q I understand that you were frightened, so you say, and you were concerned and endangered. If you will bear with me just stick with the concept of blocking someone from moving on the pond. Do you contend—are you saying that Galella was trying to stop your boat from moving on that pond, to go where it wanted to go?

A I believe that he was trying to do that, so when our engine finally started, we made it go as fast as we could. My boat was faster than his, and we got out into the—past where he was. But I thought as it is a narrow way to go out, that he might have been blocking so he could take pictures. I had no idea what he was going to do.... [I]t's a very narrow little private cove where my boat was moored, and so he could have done many things. I never know what he's going to do.

Mrs. Onassis reported this entire incident to the Coast Guard.[87] The undated but signed Coast Guard report by her (plaintiff's exhibit 20)[88] reads in part: "At 2:20 P.M.—September 6, 1981 in Herring Creek Cove while attempting to board my Sea Craft in a small dinghy marked Red Gate, in windy weather and choppy water I was harassed by 3 photographers.... They approached too closely, their wake endangered boarding the Sea Craft. This is only one of several incidents in the last 2 weeks when photographers (I believe these same ones) have been harassing me—by land, and by boat. Now that they have discovered where I keep my boat, which I use every

day in good weather, I am fearful of their harassment in the future."

\* \* \* \*

Movant maintains that Galella has violated sections 4(i), 4(iii) and 4(v) of our order of January 8, 1975 as clearly and convincingly demonstrated by the proof adduced: On September 6, 1981 Galella intentionally went to Menemsha Pond to seek out and photograph Mrs. Onassis; that Galella came within twenty-five feet of Mrs. Onassis; that Galella caused her fright when his boat approached too closely and forced the Onassis boat to stall; that Galella harassed and alarmed Mrs. Onassis; and that Galella blocked the movement of Mrs. Onassis about Menemsha Pond. For his part, Galella maintains that he was only seeking, as his fellow photo-journalists were, newsworthy photographs; and that the proof adduced—" 'truth', as we employ that term in [Galella's] brief"—is insufficient for a finding of contempt here.

Stripping this record of all the contradictions and inaccuracies set forth, we are left with the truth: Galella violated section 4(i) of our order by approaching within a distance of twenty-five feet of Jacqueline Onassis; Galella violated section 4(iii) by blocking the movement of Mrs. Onassis on Menemsha Pond; and that Galella violated section 4(v) by engaging in conduct which was reasonably foreseeable to harass, alarm and frighten Mrs. Onassis. Indeed, Galella's intentional behavior on Menemsha Pond paralleled his actions on Eighth Avenue. In his pursuit of an opportunity to photograph Mrs. Onassis, Galella knew no bounds despite the unequivocal provisions of our order.

This is not a game of semantics where the astutely articulate prevails. We find unacceptable Galella's bold-faced insistence that he did not go to Menemsha Pond "... for the singular purpose of taking [Mrs.

---

87.  H.T. 368.

88.  Counsel for both sides stipulated to the admissibility of this document. See Post-Trial Memorandum on behalf of Plaintiff, Ronald E. Galella, in Opposition to the Motion to Punish

for Contempt dated January 7, 1982 (Memorandum in Opposition) p. 12; Reply Memorandum in Support of Motion for an Order of Civil Contempt dated January 14, 1982 (Reply Memorandum in Opposition), p. 11.

Onassis'] photograph."[89] The proof adduced on this score—even Galella's own testimony—is inapposite. We examine another point: Galella, in essence, contends that since the boat in which he traveled came equipped with a driver, he, Galella, had no control over how close it came to Mrs. Onassis; that it is significant that Mrs. Onassis did not remember that the driver constituted a fourth member of the Galella party on Menemsha Pond.[90] Obviously the subject of this litigation is Galella, not the driver of his boat. Movant, frightened and apprehensive, kept Galella under close scrutiny. Under the circumstances, who else was in his boat and what they were doing was of little or no concern to her. Further, our order encompassed "Galella, his agents, servants, employees, and all persons in active concert and participation with him . . . ." No quantum leap is required to overpower the weak assertion that it was not Galella's fault.

Galella's contention that he only sought newsworthy photographs purposely misconstrues the fundamental purpose of our order. We did not preclude Galella from pursuing this photographic subject; we limited the distance and manner in which he may proceed to do so. We did our utmost to strike a balance between the rights of Galella and Mrs. Onassis.[91] Indeed, the Court of Appeals stated in its opinion: "As modified, the relief granted fully allows Galella the opportunity to photograph and report on Mrs. Onassis' public activities. Any prior restraint on news gathering is miniscule and fully supported by the findings."[92]

## Moshup Trail

The next incident complained of, this time by Caroline B. Kennedy, occurred while she and a friend were bicycling on Moshup Trail on September 7, 1981, the day after the Menemsha Pond incident.[93] The following constitutes the clear and convincing proof adduced on this episode.

Moshup Trail is some fifty feet outside the boundary of Mrs. Onassis' property on Martha's Vineyard.[94] As to the trail on this particular occasion, Ms. Kennedy testified:[95] " . . . It is a cutoff from the main road which circles around the end of Martha's Vineyard, and it is about a narrow two-lane road with a fair amount of curbs. It has no shoulder. It is totally about 30 feet wide. Q Was there any other traffic on the road on that day? A There were cars going back and forth to the beach, since it was Labor Day, Monday."

At the hearing, Galella made clear why he, his wife and fellow photo-journalist Paul Adao were traveling on Moshup Trail on that occasion:[96] " . . . We rented a car and went down, exploiting the island of Martha's Vineyard. There are many celebrities that live there that we tried to look for. *But our favorite, my favorite, and to me the biggest celebrity in the world is Jacqueline Onassis. . . .* Your Honor, we went in the rented car, we went to the beach, we were heading for the beach on Gay Head. There's a beach with cliffs. We hoped to find Mrs. Onassis or her children water skiing on the beach there. And on the way my wife spotted Caroline Kennedy on a bike with another friend on another bike." (emphasis ours)

Ms. Kennedy forthrightly described the initial stages of this encounter: " . . . I heard a car behind me, following. . . ."[97] In her affidavit she stated:[98] "The car—a

**89.** Galella Affidavit, p. 4.

**90.** Memorandum in Opposition, pp. 10–11.

**91.** *See, e.g., Galella, supra,* 353 F.Supp. 201, n. 9.

**92.** *Galella, supra,* 487 F.2d at 999.

**93.** H.T. 49; Affidavit, Caroline B. Kennedy, verified November 5, 1981 (Kennedy Affidavit) ¶¶ 1-2.

**94.** *Id.*

**95.** H.T. 49.

**96.** H.T. 519–20.

**97.** H.T. 49.

**98.** Kennedy Affidavit, ¶ 3.

brown four-door model—tailed us for a while instead of passing . . . ." " . . . I pulled over to the side of the road and kept on bicycling. It was sort of sandy there, so I was a little bit nervous about that, that I might fall . . . . It followed for a while, and then the car pulled up alongside of me and continued to go alongside of me with Mr. Galella and a couple of other people leaning out of the window . . . . [Galella] was shouting, and they were all taking pictures, or two of them were taking pictures . . . . [Galella said:] 'Hi, Caroline, how are you? It's me.' That kind of thing." [99]

At this particular stage of the incident, Ms. Kennedy clearly testified that *Galella was "about a foot and a half" from her.*[100] (emphasis ours) Having recognized Galella, Ms. Kennedy and her friend turned around and headed in the opposite direction: "[Galella's car then] sped ahead and pulled into a clearing on the opposite side of the road . . . . I turned my bicycle around and started heading back towards the beach . . . . [W]e heard them turn around, and then screech forward and follow us. I heard the driver gunning the motor which forced me to the side of the trail to avoid a collision. The car then sped past me in the middle of the oncoming lane of traffic, pulled about thirty feet ahead of me and stopped." [101]

On cross-examination, Ms. Kennedy clarified her last statement: [102]

Q . . . Now, when you say 'the car pulled,' you're talking about Galella's car; correct?

A Yes.

Q He pulled up and stopped 30 feet ahead of you; is that right?

A Yes.

Q Okay.

A Passing me, though.

Q All right, he passed you. Within about a foot and a half.

. . .

THE WITNESS: Within—*he came very close, within about a foot and a half passing me*, and then pulled ahead . . . .

Q So a car passed you that Galella was in coming close to you, a foot and a half, pulled 30 feet ahead and stopped; is that correct?

A Yes . . . . (emphasis ours)

Ms. Kennedy's encounter with Galella continued: [103]

Q What happened then?

A Then Mr. Galella got out of the car.

Q What did he do?

A He left the door open and was standing in the middle of the road. And as I approached, was saying more things to me.

Q What did he say to you?

A 'Hi, who's your friend.' You know, 'what's the matter with you? Don't you like me?' That kind of thing . . . .

THE COURT: If you remember what else was said, you cannot dismiss it by just saying 'that kind of thing.' I do not know what that means. If you remember what was said that prompts you to say 'that kind of thing,' I have got to know it. What else do you remember was said? Do not dismiss it by saying 'that kind of thing.'

THE WITNESS: 'Who's your friend? Take it easy. Hi.' That's basically it.

THE COURT: Do you remember anything else?

THE WITNESS: No.

---

**99.** H.T. 49–50; *See, e.g.,* Plaintiff's Exh. 19.

**100.** H.T. 51.

**101.** *Id.; See also* Kennedy Affidavit, ¶¶ 4–6.

**102.** H.T. 78–79.

**103.** H.T. 52–54; 70; 79; *See also* Kennedy Affidavit, ¶ 7; *See, e.g.,* Plaintiff's Exhs. 1, 2, 3. The reason Galella stopped his vehicle in the middle of the road was made clear by his own testimony as well as that of Paul Adao. Galel-

la: " . . . I stopped the car, pulled over—I stopped the car. I was still on the road, because there was not much of a shoulder on this—it's a very—it's a trail, Moshup Trail . . . ." H.T. 520.

Adao: " . . . We pulled up . . . ahead of her, stopped the car on the right hand side of the road without going off the road, because there was sand on the road, and we didn't want to get stuck . . . ." H.T. 490.

THE COURT: How far was he from you at the time he said that? What was the distance?

THE WITNESS: Well, I was approaching him on my bicycle.

THE COURT: What was the distance?

THE WITNESS: *It ranged between 15 and one foot....*

Q Was he continuing to photograph you?

A Yes. (emphasis ours)

Ms. Kennedy's affidavit asserts that the position of Galella's vehicle—in the middle of the lane—blocked her movement in that lane: "Galella ... left his door open blocking my path on the trail and forcing me either to swerve into the oncoming lane of traffic or to collide with him. Galella was calling my name in a loud voice and asking 'How are you doing?,' 'How are you?' 'Look right here' and 'Who's your friend?'"[104]

The incident ended when Ms. Kennedy and her friend passed Galella and went to the cutoff from Moshup Trail to the beach: "Q. Did you then pass Mr. Galella and his car? A. Yes...." Her affidavit states: "In doing so, I came within about a foot of Galella before I was forced to swerve into the oncoming lane of traffic to avoid hitting him. At this point Galella shouted 'Hey, take it easy Caroline.' I finally reached the cut-off from the trail to the beach and Galella and his assistants did not follow."[105]

On cross-examination, Ms. Kennedy gave her reason for not stopping on the side of the road when Galella and his vehicle blocked her passage:[106]

Q Did you stop your bicycle or did you just keep coming?

A I kept going.

Q Is there any reason that you didn't pull off to the side of the road if you didn't want to encounter Mr. Galella and stop there?

A There was a car coming behind....

Q But you didn't—but if you want to get away from Mr. Galella, is there some reason you didn't pull off to the side of the road?

A Yes.

THE COURT: What's the reason?

THE WITNESS: That he might come and start photographing me while I was standing there....

Q Now, is there anything you know of that prevented you, other than not wanting to be photographed, from stopping along the highway right here along where I'm indicating [indicating plaintiff's exhibit 3]? Was there anything preventing you from doing that?

A I wanted to get to the beach.

Q You wanted to get to the beach and you didn't want to be photographed.

A Right.

Q But was there anything along the highway that obstructed you or kept you from stopping there?

A There is sand there and it's slippery on a bicycle.

As to her reaction at that time to the entire incident, Ms. Kennedy testified:[107] "*Well, I was frightened, and I noticed my heart beating very fast....* I didn't know what he was going to do. And since there was traffic coming in the other lane, I didn't—it made me very nervous, and I didn't know if I would—since we couldn't see around the corner—I didn't know whether I should get out into the other lane or not. So I ˌhad sort of panicked." (emphasis ours)

On cross-examination:

Q Were you angry?

A *Frightened.*

Q *Frightened?*

A *Frightened.*

Q What were you frightened about? Please tell us. What frightened you?

---

104. Kennedy Affidavit, ¶ 7; *See also* H.T. 79.

105. H.T. 54; Kennedy Affidavit, ¶ 8; *See also* H.T. 523.

106. H.T. 80–81; *See, e.g.,* Plaintiff's Exhs. 1, 2, 3.

107. H.T. 55; 70.

A   That I was—the side of the road where I was, there is no—it is sandy. I didn't want to fall off my bike. Then there's a series of guard posts with a drop-off. I felt that I was being edged over onto that side of the road. (emphasis ours)

At the hearing Galella's counsel fruitlessly attacked the veracity of this witness on this score by dissecting portions of her affidavit. In part, her affidavit reads "... I felt threatened and trapped...": [108]

Q   ... What did you feel threatened of? Having your picture taken?

A   Or being hit by a car.

Q   You felt threatened about a car hitting you possibly; right?

A   Yes.

Q   And trapped, were you referring to Galella taking your picture?

A   Well, he was in front of me and there was a car coming up behind me....

Q   Now, you then say, 'I temporarily lost my sense of judgment and I felt terribly afraid out of all proportion to the actual danger Galella posed.' [109]   Now, Miss Kennedy, what you are saying there, as I understand it ... is this: That Galella, in all reality, didn't pose that much of a danger to you, you just felt that way; correct? Isn't that true?

A   He posed a danger, I think.

Q   Well, but it was all out of proportion to the actual danger that he posed; is that right?

A   Well, I was very frightened....

THE COURT: ... You were the one who made the statement, so what did you mean by that, those words?

THE WITNESS: I meant that I am used to having my picture taken, and it doesn't make me afraid except for when Mr. Galella appears, since he's proved unpredictable and he's caused close to accidents in the past, it makes me very nervous and I don't—I just might want to get away from him as fast as I can.

THE COURT: So that feeling of nervousness may be due primarily to past experiences and you thought that this might be a duplicate of those past experiences; is that it?

THE WITNESS: Yes.

THE COURT: But actually it was not; is that what you're saying? Are you saying that it really wasn't that bad, or am I mistaken?

THE WITNESS: Well, I think that it actually was. You know, I'm not normally that nervous....

The totality of the day's occurrences were reported to Mrs. Onassis by her daughter: [110]

Q   Now, what did your mother say to you when you told her about this?

A   I don't recall exactly.

Q   Did she say, 'Let's take Ron Galella to court'?

A   She said that she was thinking about it.

Mrs. Onassis also testified as to this conversation: [111]

THE COURT: ... Now, Mrs. Onassis, will you please tell us what Caroline said to you on that occasion and what you said to her with regard to it.

A   Caroline told me that Galella had nearly run her down on the road, she was very upset, agitated. I was very upset.... I asked her to describe the incident to me. She told me of the sandy road and the overdrop.... I said to her, 'We will have to do something about Galella, we will have to go to court.' I also said some comforting words.

\*   \*   \*   \*

Movants argue (in their post-hearing memoranda) that on the basis of the clear and credible proof adduced on this incident, Galella should be held in contempt again for violation of our order of January 8, 1975. Respondent maintains that this incident

108.   H.T. 87, 88, 90–91; Kennedy Affidavit, ¶ 9.

109.   *Id.*

110.   H.T. 95–96.

111.   H.T. 265–67.

only "coincidentally happened"; that Ms. Kennedy exaggerated in her testimony; that we can not hold Galella in contempt as a matter of law because our permanent injunction no longer applies to Ms. Kennedy (at age 24). Here again, we are compelled to find respondent's arguments unavailing and without merit.

We find that Galella violated sections 4(vii) and 4(viii) of our order by engaging in conduct which could reasonably be foreseen to place the safety and well-being of Caroline B. Kennedy in jeopardy and to harass, alarm and frighten her. Galella forced Ms. Kennedy over to the side of the road onto a sandy section where a bicyclist could easily fall; he blocked her path in the lane in which she was traveling; he caused her to swerve into a lane of on-coming traffic. We find he fully intended by his conduct to accomplish the results which ensued.

Galella also violated section 4(ix) of our order by approaching within 30 feet of the person of Ms. Kennedy when he first passed her on Moshup Trail; on his second passing of her; and again when he stopped his vehicle in the lane in which she was traveling.

To Galella, this incident "happened coincidentally." We do not so regard it. Galella was the catalytic cause *ab initio* of what transpired here. His own testimony fortifies that conclusion.[112] Having set out to pursue and photograph his "favorite" subjects, Galella succeeded.

We find equally unpersuasive Galella's argument that Ms. Kennedy's testimony was exaggerated. She was subjected to thorough and penetrating cross-examination. We find she was forthright and convincing. Counsel for Galella makes much of the fact that the shoulder of Moshup Trail was not as sandy as Ms. Kennedy testified. But we also have to the same effect Galella's careful testimony as to why he stopped his car on the road instead of the shoulder; this, combined with the testimony of Paul Adao that their car didn't pull off to the shoulder because "there was sand" and they ". . . didn't want to get stuck. . . ."[113]

◼ As to Galella's argument that as a matter of law Ms. Kennedy is no longer protected by our order of January 8, 1975 *from which no appeal was taken*: It is fundamentally axiomatic in law that a contempt hearing for violation of a prior court order is not an avenue of attack, collateral or otherwise, of that order. *Maggio v. Zeitz*, 333 U.S. 56, 59, 68 S.Ct. 401, 403, 92 L.Ed. 476 (1948); *N. L. R. B. v. Local 282, International Brotherhood of Teamsters*, 628 F.2d 994, 998–99 (2d Cir. 1970).

### Winter Garden Theatre

In the evening of September 23, 1981 Mrs. Onassis went to the Winter Garden Theatre, Broadway and 51st Street, New York City, to see a performance "The Catherine Wheel" by the Twyla Tharp Dancers. She and a friend were the guests of Mrs. Twanette Tharp Garvey (Mrs. Garvey) and Mr. Harry Garvey (Garvey).[114] Garvey, an architect by profession, had built a home for Mrs. Onassis, and in the course of this professional relationship the Garveys and Mrs. Onassis had become friends. Mrs. Garvey is an architectural designer.[115] The following constitutes the clear and convincing proof on this event.

Galella testified[116] he had been at the Winter Garden Theatre the previous evening, the official opening of the show, and had "got several good pictures that night of different celebrities. . . ." Because of this apparent success, Galella returned to the theatre on the evening of September

---

112. H.T. 519-20.

113. H.T. 490; *See also* H.T. 520. This is but one illustration (in the briefs in opposition) of the seemingly endless misinterpretation of unambiguous testimony.

114. H.T. 109, 169–70, 215, 269; *See also* Onassis Affidavit, ¶ 8.

115. H.T. 214, 219, 425.

116. H.T. 511–12.

23rd.[117] Mrs. Onassis testified that she did not go to the opening night performance so as to avoid the photographers.[118]

The Onassis party arrived at the theatre approximately 7:45 P.M.; their limousine was immediately spotted by Galella who began to take pictures with his motor driven flash camera. Mrs. Onassis testified about her initial encounter with Galella that evening:

Q Did you see Mr. Galella when you arrived at the theatre?

A Yes, I did.

Q How far away from you was Mr. Galella when you got out of your car?

A *A few feet. Under ten, I would say.*

Q Were there other photographers there?

A Yes, there were at least two others, I believe.

Q What was Mr. Galella doing as you got out of your car?

A Mr. Galella was photographing me and running and jumping backwards into the theatre in front of me, blocking my path. We got through the glass doors into the inner lobby. He's jumping around and bumping and flashing his lights. We couldn't get through to the next set of doors where you get inside the theatre proper. Then while we were giving our tickets to the tickets man, *he* barged through a side door and *was there in front of us taking pictures.* One of the ticket people yelled, 'Get him out of here.' Then there was a scurrying and I saw somebody getting him out... To the best of my recollection, there were two people that were shorter than Mr. Galella, pushing forceably to get him back through the theatre doors.[119] (emphasis supplied)

On cross-examination Mrs. Onassis described the manner in which Galella photographed her:[120]

Q Well, you told us he was backing up... Did he stop?

A He changed his position. He moved around. He jumps. He's one time on the side, another in front.

Q He jumped to the side, he took a picture; he jumped to the front, took a picture; backed up, took a picture, and continued on to the lobby; is that right?

A Yes.

In her affidavit, Mrs. Onassis also stated that as Galella was taking pictures of her while she entered the theatre, he was "making scary grunting noises and grinning."[121]

Mrs. Onassis' testimony concerning this encounter with Galella was convincingly supported by the Garveys. Garvey testified: "... Mrs. Onassis, my wife, Twanette, Maurice Tempelsman and I arrived at the Winter Garden Theatre at approximately 7:45. At that time, I noticed Mr. Galella and I believe two other photographers approach the limousine which we arrived in. As we began getting out of the vehicle, Mr. Galella and the other photographers began snapping pictures of Mrs. Onassis."

Q Would you describe the physical movements of Mr. Galella at that time?

A Yes. ... We got out of the limousine, Mr. Galella and the other photographers began taking pictures of Mrs. Onassis as we walked into the Winter Garden Theater. They were moving about, kind of darting and jumping about to get the best possible vantage for taking photographs of her. As we got to the—one of the ushers who was collecting tickets, Mr. Tempelsman asked me for the tickets. I handed them to him. And just at about that time Mr. Galella darted by the usher and into, well, into another lobby section beyond the main ticket lobby, and he positioned himself there, as Mr. Tempelsman, Mrs. Onassis, my wife and I went through, beyond the usher, into the thea-

---

**117.** H.T. 405.

**118.** H.T. 215; 511; 557–58.

**119.** H.T. 270–71; *See also* Onassis Affidavit, ¶¶ 9, 10.

**120.** H.T. 410.

**121.** Onassis Affidavit, ¶ 13.

ter [sic]. Just immediately after he darted through like that, one of the ushers went over to him and said something to the effect of, 'Don't try that again,' or, 'You can't do that here.' I don't recall his exact words, your Honor, but it was something like that.[122]

In his affidavit, Garvey stated that as Mrs. Onassis entered the theatre, Galella was within twenty-five feet of her: "As we walked, Galella . . . ran in front of us taking pictures continuously. At all times during our walk into the lobby, I estimate that *Galella . . . [was] no more than five to eight feet in front of Mrs. Onassis and me.*" [123] (emphasis ours)

On cross-examination, Garvey also explained how Galella's behavior differed from that of the other photographers present: [124]

Q Was the conduct of the photographers about the same, all of them, trying to get the best picture, positioning and and sort of jumping around a bit?

A I would say that Mr. Galella was perhaps a bit more aggressive than the others.

Q A bit more aggressive?

A Yes. He was the one that I observed bolt by the usher collecting the tickets.

Mrs. Garvey's testimony on this score was likewise candid and forthright:

Q Would you describe the circumstances under which you saw him on that evening?

A We were at the Winter Garden Theatre, arrived in a limousine, and as we approached the theatre and stopped at the curb, I noticed a limousine in front of ours with two photographers looking into that particular limousine. Then I looked to my side and I saw a photographer down low on the sidewalk, sort of in a crouching position, and we opened the door, and he started taking pictures as we got out of the limousine, particularly when Mrs. Onassis got out of the limousine. And at that point—

Q Who was that person, if I may interrupt?

A That took the pictures?

Q Yes.

A Mr. Galella was taking the pictures.

.   .   .

Q *Can you describe the manner in which Mr. Galella and the other two photographers were taking photographs of Mrs. Onassis?*

A *They were facing us. They were walking backwards into the theatre as we were walking forward.* They were probably—*as we got out of the limousine, they were probably maybe ten feet away,* and then we walked closer to them. And from the time until we got into the first lobby, *I would say we were from five to ten feet off them at all times.*

Q Were they using motor driven cameras with flash attachments?

A Yes, they were.

.   .   .

Q Do you recall the period of time during which Mr. Galella took photographs of Mrs. Onassis as she entered the theatre?

.   .   .

A It continued until we got into the theatre and got past the ticket-takers.

Q Did anything happen at that point in time?

A As we were—as my husband gave the tickets to the ushers or the ticket-takers, I noticed some shoving and pushing or some type of commotion was going on, . . .[125] (emphasis ours)

Manuel L. Levine (Levine) the house manager of the theatre and responsible for crowd control and the safety of the patrons was on duty at the theatre that evening.

122. H.T. 215–17.

123. Affidavit, Harry Garvey, verified November 4, 1981 (Garvey Affidavit) ¶ 4.

124. H.T. 237.

125. H.T. 170–73; *See also* Affidavit, Twanette Tharp Garvey, verified November 3, 1981 (T. Garvey Affidavit) ¶¶ 2–6.

At the time of the Onassis party's arrival (approximately 7:45 P.M.) Levine was stationed in the inner lobby of the theatre, located between the ticket takers and the seating area, as was his customary practice.[126] Levine testified:

> ... Three photographers had bust past the ticket-takers and were flashing pictures. I rushed forward to evict them.
>
> Q Was Mr. Galella one of those three?
>
> A Yes, he was.
>
> Q Could you describe his physical movement or activities any more specifically?
>
> A Well, understand, it was shortly before curtain time. The theatre seats approximately 1500 people. It was pretty near sold out performance. There's a lot of people entering at that time. So what I saw was these photographers moving about very quickly and obviously pursuing someone and trying to position themselves in front of Mrs. Onassis in order to take her picture, and taking pictures.
>
> Q How [close] did Mr. Galella come to Mrs. Onassis, at that time?
>
> A *Five to ten feet.*[127] (emphasis ours)

Levine tried to stop Galella and get him to leave the theatre. Levine described his efforts:[128]

> ... I was between the photographers and the Onassis party, and was becoming more insistent that they leave.
>
> THE COURT: And how did you register your insistence, if you did at all?
>
> THE WITNESS: Yes, I kept saying, 'Please leave the theatre.'
>
> THE COURT: And what happened immediately thereafter?
>
> THE WITNESS: Well, the first time I said it, I was totally ignored.
>
> THE COURT: All right. And the second time?
>
> THE WITNESS: I was ignored again.

Levine then called for the assistance of a theatre employee and Galella was physically escorted from the theatre by the two of them.[129]

The Onassis party was seated, Garvey next to Mrs. Onassis. Garvey testified on cross-examination as to a conversation he then had with Mrs. Onassis:

> Q ... Now, let me ask you this: I asked you about Mrs. Onassis expressing any upset upon leaving. When you went into the theatre, she didn't say anything to you about being upset about being photographed, sir, in all fairness?
>
> A Yes, she did.
>
> Q She did?
>
> A Yes.
>
> Q At what point did she say something to you?
>
> A When we got into the theatre and sat down, I sat down next to Mrs. Onassis for the performance, and I remarked to her something like, I said, 'Boy, that was really something, you know, this barrage of photographs and confusion and chaos and so forth.' And she said to me, 'It's upsetting,' but she tries not to let it get the best of her.[130]

Galella's testimony on this score was largely an attempt to justify his behavior rather than a denial that his actions constituted a violation of our order:

> ... I was there the night before, which was the official opening. I got several good pictures that night of different celebrities—of the opening night. So I checked it, the next night, which was the 23rd, and we got pictures—and when I say 'we,' I mean there were other photographers—David McGough—and David McGough is a friend of mine. You know, we talk photograph. We photographed Merryl Streep and her husband coming into the theatre, and they even posed for us. That was it. Then we saw another limousine. I noticed Jacqueline Onassis

---

**126.** H.T. 106–09; *See also* Affidavit, Manuel L. Levine, verified November 6, 1981 (Levine Affidavit) ¶¶ 2–4.

**127.** H.T. 110–11.

**128.** H.T. 116–17.

**129.** H.T. 112, 217; Levine Affidavit, ¶ 6.

**130.** H.T. 230.

through the window, and I kneeled down to prepare for taking pictures. Of course, there was a lot of a crowd in front of the theatre waiting to go into the theatre, so it was difficult to get a clear view of Mrs. Onassis alighting her limousine. David McGough was there, also shooting, and I was sort of behind him. But I can't give you an accurate distance of how far I was behind from Mrs. Onassis. I'm concentrating, when I'm taking pictures, of the subject, Mrs. Onassis, and she is the main subject here, that night. I backed up into the theatre lobby, photographing her, and I tried to get past the usher to take more pictures.

The reason why we take more is because . . . people are in the way. It's like football. We're dodging spectators.

THE COURT: That's what you were confronted with that particular night?

THE WITNESS: Yes.

THE COURT: All right. Please continue.

A [Continuing] So I managed to get past the usher, and I was pushed out by Mr. Levine, he got me out, and that was it.[131]

Once he left the Winter Garden, Galella went to Lincoln Center to be with his wife who was taking pictures of celebrities arriving at a performance of the New York Philharmonic. Along with McGough, the three then went to dinner.[132]

The performance of the Twyla Tharp Dancers ended at approximately 9:30 P.M., and the Onassis party proceeded to exit the theatre. Galella, his wife and McGough were also there, ready to photograph Mrs. Onassis again.

Mrs. Onassis described Galella's behavior as she tried to leave the theatre:

Q Did you see Mr. Galella after the performance?

A Yes, I did.

Q Where was he and what was he doing?

A As we came out into the theatre lobby, he was there, *jumping around, taking pictures of me, bumping me and my party, causing us to get separated from each other, bumping other people in the crowd and causing them to stumble over each other and fall back.* Then isolating me.

So in walking through the lobby, the one person I could manage to make out in the flashbulb's light was Harry Garvey, and I grabbed his arm and said, 'Harry, help me get through this.' And he did. We got out to the sidewalk, again with Galella jumping around, *sometimes as close as three feet to me.* Then I was worried; I saw Twanette Garvey run around the car to get in on the street side where there was traffic going up and down. I thought, she is going to get hit by a car. Then we got all piled in the car somehow and moved away.

Q *Was there anyone blocking the street side passenger door to prevent Mrs. Garvey from entering the car on that side?*

A Yes, the far side. Yes.

Q *Who was blocking it?*

A *Galella.* So then she came running back. So she was running—

Q What happened—excuse me, I'm sorry. Have you finished your answer?

A Well, she was running around the car like a frightened animal, I thought. And I didn't think that was fair.[133] (emphasis ours)

Mrs. Garvey's testimony was equally candid and fully supported Mrs. Onassis' testimony:

. . . As we were leaving, again at the same point where the ticket-takers are, I heard one of them say something like: 'Don't let me' . . . I heard one of the ticket-takers say, 'Don't try that again.'

Q What was the ticket-taker doing then?

---

**131.** H.T. 511–12.

**132.** H.T. 563.

**133.** H.T. 271–73; *See also* Onassis Affidavit, ¶¶ 12–14. Plaintiff's Exhs. 4, 5.

A   He was—he seemed to be confronting Mr. Galella.

.   .   .

Q   Did you then leave the theatre?

A   Yes, we left the theatre.

Q   Did you see Mr. Galella as you left?

A   Yes, we tried to leave the theatre, and Mr. *Galella was standing in front of us* with the other two photographers. At this time they started to circle our group, taking pictures as rapidly as they could.

.   .   .

Q   How close was Mr. Galella to Mrs. Onassis, at that point?

A   He was at least—*he was no further than five feet from her.*

Q   Could you describe more particularly the physical movements of Mr. Galella at this time?

A   Well, he was changing his position, trying to get better angles of her. The outer lobby was very crowded and it was hard to move around. So I just—I left, and I left with Mr. Tempelsman. We were standing out on the sidewalk, looking back in at what was going on, and I saw Mrs. Onassis standing there alone, without any escort. My husband was behind her at this time. She took his arm and—

Q   Had she become separated from your party?

A   Yes.   She walked forward with him, very slowly, because it was crowded, and because of all of the photography that was going on, the people in the lobby started to part. They just stood by and watched and started pointing, saying 'There's Mrs. Onassis.' By this time it was a scene.[134]   (emphasis ours)

Garvey, who took Mrs. Onassis' arm and helped her leave the theatre amidst all the commotion, testified that Galella came within the proscribed distance from Mrs. Onassis:[135]

THE COURT: How close did Mr. Galella get to Mrs. Onassis from the time you rose to leave the seats?

THE WITNESS: I would say the distance ranged from approximately *five to ten feet.*

THE COURT: Your work is architectural, isn't it?

THE WITNESS: That's correct.

THE COURT: You're constantly dealing with measurements, aren't you?

THE WITNESS: That's correct.

THE COURT: Well, then I expect from you as close a measurement as you can possibly give under oath.

THE WITNESS: That's correct.   In the course of [our] business, your Honor, we frequently—to measure something, your Honor, we often [pace] it off. And a pace, I usually think of, is three feet.   I would say, your Honor, at all times *Mr. Galella was between two and four paces from Mrs. Onassis.* (emphasis ours)

Levine explained that he again tried to have Galella leave the theatre; that he escorted Mrs. Onassis part way out of the theatre; that Galella came within 25 feet of her while taking pictures:

. . . I walked with her to the outer lobby where we encountered the photographers again. I would say, oh, *four paces from the outer doors, I stepped between Mrs. Onassis and Ron Galella,* and raised my arms and said, 'Please, leave the theatre.' At that point in time, your Honor, Mrs. Onassis had reached the outer doors, exited. The Galella group ran through the center doors, exited, followed her to the limousine.

.   .   .

Q   When you saw them both in the outer lobby, how close was Mr. Galella to Mrs. Onassis?

A   *Five to ten feet.*

Q   *And this was during the period that he was photographing her, is that correct?*

---

**134.**   H.T. 173–76; *See also* T. Garvey Affidavit, ¶¶ 7 9.

**135.**   H.T. 219; *See also* Garvey Affidavit, ¶¶ 6, 7.

A   Yes.[136]   (emphasis ours)

Galella's own testimony on this score supports that given by Mrs. Onassis. Galella admitted that he gained entry into the theatre where he photographed Mrs. Onassis; that he was "pushed out" of the theatre by Levine; that he took pictures of Mrs. Onassis from the other side of her limousine.[137] What is particularly striking about Galella's testimony on this episode is his marked, studied failure to even mention or refer to the distances between himself and Mrs. Onassis at various times—as though that vital factual issue was of no consequence.

Mrs. Galella, present at the theatre as Mrs. Onassis exited, testified that her husband came within twenty-five feet of Mrs. Onassis: [138]

> ... There was some delay in the party getting into the limousine. They made their way to the car. We continued to photograph from a distance. *Ron Galella was never closer than 10 to 15 feet from her at any one time.*
>
> THE COURT: *You mean with regard to taking pictures?*
>
> THE WITNESS: *Yes, sir.*
>
> THE COURT: Taking photographs?
>
> THE WITNESS: Yes, sir, taking photographs. (emphasis ours)

Galella testified that from the beginning of that evening until Mrs. Onassis left the theatre, he took approximately fifty pictures of her in and around the theatre.[139]

Mrs. Onassis and the members of her party finally gained entry into the limousine and departed from the theatre. They had planned to go for a drink or perhaps a walk around Rockefeller Center. However, plans for a pleasant conclusion to the evening had to be abandoned. The members of the group soon noticed that they were not rid of Galella—he was pursuing them in his automobile through the streets of New York City. Mrs. Onassis testified as to Galella's action in this third irritating episode of the evening:

... And I saw a yellow car following us with Galella driving and laughing. There were two other people in the car with him, a male and a female. I believe the female—I can't be sure which was in the front seat or not, but he was laughing, and every time we turned a corner, that is my impression, he'd laugh and spin the wheel. They followed us very closely, sometimes tailgating, really close. They followed us. We were going to, you know, stop at Rockefeller Center or go have a drink somewhere after the theatre or do something, when we saw him following, we decided to return straight to the Garveys where they were staying. So we drove all the way to 73rd Street near Third Avenue, all the way. Galella was following all the way and laughing. When we stopped to let the Garveys out, I noticed that Galella jumped out onto the sidewalk with his camera. But when just the Garveys got out of our car and went into the building, and I didn't get out, he didn't take any pictures... We had to turn down Lexington Avenue. He was still following us. Then I was really upset. I said, 'I want to, you know, do something. Can't we get rid of him?' And they asked the chauffeur of the car to get a police car on an intercom radio. He tried, but he couldn't pick them up in time. Suddenly I saw two policemen standing on the corner of Lexington Avenue and 67th Street, I think. I said, 'Please stop the car. Maybe these people can make Galella go away.' And Mr. Tempelsman jumped out and told them that Galella was following us. So, when Galella saw Mr. Tempelsman speaking to one policeman or two, their yellow car veered off to the right, towards Park Avenue.[140]

On cross-examination, Mrs. Onassis further described Galella's behavior and her reactions to it:

**136.**  H.T.  119–22;  *See also* Levine Affidavit, ¶¶ 7- 9.

**137.**  H.T.  511–17.

**138.**  H.T.  567–68.

**139.**  H.T.  557–58.

**140.**  H.T.  274–75.

Q Mrs. Onassis, would you continue your testimony as to what happened on the evening of the 23rd at the time you approached these two policemen on Lexington Avenue, what Mr. Tempelsman said.

A Mr. Tempelsman, got out of the car, spoke to policemen. As he was speaking to them, the yellow car behind me bearing Galella veers off on the side street towards Park Avenue... The police that Mr. Tempelsman was talking to, suggested we go to the police station, which was a block or so away.... I was determined to go to the police station because I wanted to tell some policemen so they could be witnesses of this thing that Galella had done that night that was wrong. We went to the police station.[141]

Garvey also noticed the Galella car pursuing the limousine and testified:

Q Did Mrs. Onassis express any upset about it?

. . .

A Yes.

Q What did she say to you, sir?

A She expressed concern about the photographers following us. It was just decided that it would be best if we went home. I do not recall the exact words she said.

Q Other than that, sir, did she say anything and express any upset about the photographers who were following you?

A Anger, no; upset, yes.[142]

Mrs. Garvey testified that she too observed Galella following in a car; that he followed the limousine from the theatre until she and her husband were dropped off on 73rd Street; and that Galella's pursuit lasted approximately five to seven minutes.[143]

Galella's version of this phase of the evening's activity:

... I did follow with my wife in the car and David McGough in the car. And,

yes, I was smiling while I was following. But I was not tailgating. The reason I don't tailgate—

THE COURT: Oh, no.

THE WITNESS: Well, I don't tailgate—

MR. MITCHELSON: Just go on with the facts.

THE COURT: The facts.

THE WITNESS: I was driving, maintaining a distance, a good distance, so I wouldn't be discovered. We followed Mrs. Onassis' limousine to 73rd on the east side, East 73rd Street, I believe, and the Garveys got out, and I never got out of my car—none of us got out of our car because—

THE COURT: No, not 'because.' You didn't get out of your car.

THE WITNESS: That's right, your Honor, because we didn't see Mrs. Onassis get out. She's the one that we wanted to get pictures of.

THE COURT: All right.

THE WITNESS: And so we followed, continued to follow down Lexington Avenue, and we saw Tempelsman get out of the car, stop the limousine, and it seemed like they were making a phone call in the car. The chauffeur of the car was on the phone on the limousine. Maurice Tempelsman got out of the car, and he took my license plate number. The both cars were stopped at this time. Then they proceeded down Lexington Avenue and stopped at about 68th Street. There was, I believe, a policeman in the street, and they stopped, and Maurice Tempelsman I believe, got out of the car and started talking to the policeman. At that point I made a right on 67th Street and departed. That was it.[144]

Mrs. Galella, who was present in the car with her husband, acknowledged that he got out of the car; and that only when he

141. H.T. 281, 283–84.

142. H.T. 227–28; *See also* Garvey Affidavit, ¶ 8.

143. H.T. 180–81; *See also* T. Garvey Affidavit, ¶ 10.

144. H.T. 516–17.

saw policemen did he stop following Mrs. Onassis: [145]

Q When you followed the Onassis car, at some point did it stop?

A Yes.

Q And did you stop as well?

A Yes, we did.

Q And at some point did someone alight from the car?

A Yes. Ron got out of the car.

Q Now, at another point in time, did you see their car stop?

A Yes, we did.

.    .    .

Q But the car stopped a second time; is that right?

A Yes, it did.

Q And did your car stop a second time?

A Yes.

Q And after that, did you discontinue—I mean, not you—but did your car discontinue following the Onassis car?

A Yes, we did.

.    .    .

Q And it was only at that point that you discontinued your surveillance and following of Mrs. Onassis; is that correct?

A Yes, sir.

As mentioned hereinabove, Mrs. Onassis went to the police station; reported Galella's actions; and then received a police escort home. Galella was not seen again that evening.[146]

Mrs. Onassis gave impressively convincing testimony about Galella and his intrusion into her life that evening:

Q Will you tell us, other than as you have already testified, what your reaction was to Mr. Galella's behavior on the evening of September 23rd?

A I was extremely agitated, upset, despairing in a way because I thought Galella was going to start his pursuit of me all over again, and of my children. I didn't see that there was any recourse. I had been frightened for myself and for my friends at one course in the evening. By the time I went to bed that night, I was extremely agitated and very—very, very pessimistic about the future. I was just upset.[147]

\*    \*    \*    \*

Movant argues that Galella committed multiple violations of several of the provisions of our January 8, 1975 order; and that the proof adduced clearly and convincingly supports such a finding.[148] For his part, Galella argues that his actions on September 23rd present a situation which is "nearly barren of any justiciable controversy" and asks "Can it even be called an 'incident'?"[149]

The proof adduced at hearing clearly and convincingly shows that Galella violated our order throughout the evening of September 23, 1981.

We hold that Galella violated three provisions of our order here: (1) section 4(i)—coming within twenty-five feet of Mrs. Onassis; (2) section 4(iii)—blocking the movements of Mrs. Onassis; and (3) section 4(v)—engaging in conduct which could "reasonably be foreseen to harass, alarm or frighten" Mrs. Onassis.

Galella's remaining arguments concerning this incident only merit brief discussion.

---

145. H.T. 578. Galella called David McGough as a witness on his behalf. McGough was present at the Theatre on the evening of September 23rd, but did not watch Galella as he himself was taking pictures. H.T. 467–68. McGough was in the car following Mrs. Onassis along with Galella and his wife. However, his testimony on this episode was vague and broad; we found it unconvincing. See H.T. 470–74.

146. Onassis Affidavit, ¶ 16.

147. H.T. 285–86; *See also* Onassis Affidavit, ¶ 18.

148. Memorandum in Support, pp. 1–11; Reply Memorandum in Support, pp. 8–12.

149. Memorandum in Opposition, pp. 26–30. Post-Trial Reply Memorandum on Behalf of Plaintiff, Ronald E. Galella, dated January 15, 1982 (Reply Memorandum in Opposition) pp. 27–28.

In addition to the broad and unfounded attacks on movant's proof Galella argues: (1) that the testimony of the Garveys was rehearsed, interested and inconsistent; (2) that Levine's testimony was immaterial; and (3) that if Galella did not have the right to photograph celebrities on the evening of September 23rd, "then Galella might just as well toss his camera into Menemsha Pond and we might just as well burn down the Courthouse."[150] We find these arguments hollow and devoid of merit. Our order of January 8, 1975 and the forceful decision of the Circuit Court were designed to prevent Galella from committing certain acts while taking photographs of Mrs. Onassis and her children—not to prevent him from taking pictures of them. Mrs. Onassis does not challenge Galella's right to take photographs of her and her children. She properly insists Galella obey the Court's order. If we permit court orders to be purposely disregarded with impunity then indeed (to use the language employed otherwise by Galella's counsel) ". . . we might just as well burn down the Courthouse."[151]

It is unthinkable that the court is without absolute power to enforce compliance with its orders. The court is duty bound to defend its integrity against those who defy its authority. *See, e.g., Maness v. Meyers,* 419 U.S. 449, 458–60, 95 S.Ct. 584, 590–92, 42 L.Ed.2d 574 (1975); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911); *see also* 18 U.S.C. § 401. The court has the unswerving duty to exercise disciplinary powers of civil contempt when a proper showing has been made by an aggrieved person in whose favor the order was entered. *See, e.g., National Research Bureau, Inc. v. Kucker,* 481 F.Supp. 612, 614 (S.D.N.Y.1979); Fed.R.Civ.P. 71. A court is not free to exercise its discretion and withhold an order of civil contempt. *Vuitton et Fils S. A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir. 1979). "[I]f a court order has

been violated, the court must make the injured party whole.". *National Research Bureau, Inc. v. Kucker, supra,* 481 F.Supp. at 614 (collecting authorities).

The "validity of an order issued by a court of competent jurisdiction is not open to collateral attack in a contempt proceeding based on disobedience of that order." *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* No. 77–2004, slip op. at 3 (S.D.N.Y. June 24, 1980), *aff'd in part and vacated and remanded in part on other grounds,* 646 F.2d 800 (2d Cir. 1981); *see, e.g., Maggio v. Zeitz,* 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948); *G. & C. Merriam Co. v. Webster Dictionary Co.,* 639 F.2d 29, 34 (1st Cir. 1980).

### The right to privacy

We emphasize that the instant proceeding did not relate to a news photographer, a news reporter or a photo-journalist endeavoring to get a story, accompanied by photographs, of persons who were, and still are, the object of legitimate public interest. Our Court of Appeals put it plainly and sharply: "Nonetheless, Galella's action went far beyond the reasonable bounds of news gathering. When weighed against the *de minimis* public importance of the daily activities of [Mrs. Onassis], Galella's constant surveillance, his obtrusive and intruding presence, was unwarranted and unreasonable. If there were any doubt in our minds, Galella's inexcusable conduct toward [Mrs. Onassis'] minor children would resolve it. Galella does not seriously dispute the court's finding of tortious conduct. Rather, he sets up the First Amendment as a wall of immunity protecting newsmen from any liability for their conduct while gathering news. There is no such scope to the First Amendment right. Crimes and torts committed in news gathering are not protected . . . There is no threat to a free press in requiring its agents to act within the law." *Galella, supra,* 487 F.2d at 995–96.[152]

---

150. Memorandum in Opposition, pp. 26–30; Reply Memorandum in Opposition, pp. 27–28.

151. *Id.*

152. *See also Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 269 (1971); *Dietemann v. Time, Inc.,* 449 F.2d 245 (9th Cir. 1971).

Our modified order (as to distances only) of January 8, 1975 "fully allows Galella the opportunity to photograph and report on Mrs. Onassis' public activities." *Id.* at 999.

After all, plainly put we are dealing here with a "paparazzo" clearly spotted by our Circuit Court: "Galella fancies himself as a 'paparazzo' (literally a kind of annoying insect, perhaps roughly equivalent to the English 'gadfly.') Paparazzi make themselves as visible to the public and obnoxious to their photographic subjects as possible to aid in the advertisement and wide sale of their works."[153] *Id.* at 992.

Galella profited by being the only American paparazzo. He had the field to himself; no one else was willing to harass, torment and victimize a subject. He alone was unchecked by inner prohibitions.

Galella's objective? To establish himself as the peerless photographer who could capture the comings and goings and doings of Mrs. Onassis and her children, and by frightening them, to obtain unusual photographs which bring him handsome returns—financial and otherwise.

■ "... [U]nder certain circumstances, surveillance may be so 'overzealous' as to render it actionable." *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 307 N.Y.S.2d 647, 655, 255 N.E.2d 765, 771 (1970). "It does not strain credulity or imagination to conceive of the systematic 'public' surveillance of another as being the implementation of a plan to intrude on the privacy of another." *Id.* at 657, 255 N.E.2d at 772.

■ Mrs. Onassis is invested with a constitutional right to privacy—a right to be left alone. "The right of privacy stands on high ground, cognate to the values and concerns protected by constitutional guarantees." *Nader v. General Motors Corp.*, 57 Misc.2d 301, 292 N.Y.S.2d 514, 518 (Sup.Ct.

1968).[154] Indeed, her "right to be left alone" is exactly what Galella relentlessly and shockingly invaded—goaded on because, as he put it, "... my favorite, and to me the biggest celebrity in the world is Jacqueline Onassis." (H.T. 519–20).

## Conclusion

■ By proof that exceeds by far the burden which the law makes imperative, we are compelled to find that Galella has deliberately and persistently violated our court order of January 8, 1975 by actions and conduct offensive, menacing and contemptuous; he has thereby, we conclude, grossly disrupted and intruded upon the lives of Mrs. Onassis and Ms. Kennedy. He did not advance a legal defense for his outrageous indifference to a court order entered many years ago and designed to prevent a continuation of his shocking deportment. By impressive proof which we find candid, careful and precise, we are convinced that Galella's brazen behavior, as disclosed in the proceedings before us on this application to punish for contempt, was fully intended by him to convince Mrs. Onassis and Ms. Kennedy that even court orders could not protect them from his onslaughts.

It was exactly to avoid this eventuality that prompted us to issue the order he has contemptuously thrust aside. As the Circuit Court of Appeals noted in its opinion[155] upholding our earlier order (1972), Galella's continued misconduct towards Mrs. Onassis and Ms. Kennedy was to be anticipated and judicial effort to thwart it had to be resorted to:

Galella has stated his intention to continue his coverage of defendant so long as she is newsworthy, and his continued harassment even while the temporary restraining orders were in effect indicate that no voluntary change in his technique

**153.** The Court of Appeals also noted: "The newspapers report a recent incident in which one Marlon Brando, annoyed by Galella, punched Galella, breaking Galella's jaw and infecting Brando's hand." *Galella, supra,* 487 F.2d at 992, n. 2.

**154.** *See also Tehan v. United States ex rel. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

**155.** *Galella, supra,* 487 F.2d at 998.

can be expected... The defendant in *Flamm* [56 Misc.2d 1059, 291 N.Y.S.2d 189 (1968) ] was sued for intentional infliction of emotional distress. He was charged with having dashed at the plaintiff in a threatening manner in various public places with threatening gestures, grimaces, leers, distorted faces and malign looks, accompanied by ridiculous utterances and laughs, driven his automobile behind that of the plaintiff at a dangerously close distance; walked behind or beside or in front of the plaintiff on the public streets; and consistently telephoned the plaintiff at home and place of business and hung up or remained on the line in silence.

Galella paid no attention to the warning by the Court of Appeals that "Injunctive relief is appropriate."

For his total disregard of the provisions clearly stated in our January 8, 1975 order, Galella offered no defense whatever. Coupled with his admissions of certain violations and the concessions entered upon the record by his counsel, his complete silence as to the most serious charges against him, his testimony and the proof adduced in his behalf was totally unimpressive and quite hollow; it was overwhelmingly crushed by the opposition. In short, Galella has clearly challenged the Court.

Let it be distinctly understood, as detailed in this opinion, that, on proof positive, we find Galella purposely offended and violated the provisions of our order of January 8, 1975 on twelve (12) separate and distinct occasions:

Section 4(i) (relating to distance) at the theatre on Eighth Avenue, on Menemsha Pond and at the Winter Garden Theatre.

Section 4(iii) (blocking, impeding, etc.) at the theatre on Eighth Avenue, on Menemsha Pond and at the Winter Garden Theatre.

Section 4(v) (harassment, etc.) at the theatre on Eighth Avenue, on Menemsha Pond and at the Winter Garden Theatre.

Section 4(vii) (placing in jeopardy) at Moshup Trail.

Section 4(viii) (harassment, etc.) at Moshup Trail.

Section 4(ix) (distance) at Moshup Trail—the first nine (9) violations relating to Mrs. Onassis and the last three (3) to Ms. Kennedy.

Accordingly, we find Galella, the contemnor, in contempt of court on each of the twelve (12) violations listed.

So strong was the proof against him that we are compelled to conclude that each violation thus committed by Galella was fully intended by him, although this element of proof is not requisite in a proceeding to punish for civil contempt. In *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949) it was emphasized:

The absence of wilfulness does not relieve from civil contempt.... Since the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act. The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them a duty to obey specified provisions of the statute. An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently. The force and vitality of judicial decrees derive from more robust sanctions. (336 U.S. at 191, 69 S.Ct. at 499) (footnotes omitted)

\* \* \* \*

The untouched proof at the hearing before us establishes beyond cavil that Galella's contemptuous disregard of the prohibitions clearly set out in our order of January 8, 1975 parallels in striking detail the pattern of his offensive deportment that brought about the issuance of that very order. He went on his determined, brazen way as though our order, the opinion of the Circuit Court and all the proceedings that led up to them, never came into existence. To the total proof reflected by the present hearing record we actually apply without hesitation the decision years ago of the

Court of Appeals [156] and our official conclusions which prompted us to issue the order so repugnantly violated by Galella. Thus (by the Circuit Court):

Discrediting all of Galella's testimony the court found the photographer guilty of harassment, intentional infliction of emotional distress, assault and battery, commercial exploitation of [Mrs. Onassis'] personality, and invasion of privacy. . . . Evidence offered by the defense showed that Galella had on occasion intentionally physically touched Mrs. Onassis and her daughter, caused fear of physical contact in his frenzied attempts to get their pictures, followed [Mrs. Onassis] and her children too closely in an automobile, endangered the safety of the children while they were swimming, water skiing and horseback riding. Galella cannot successfully challenge the court's finding of tortious conduct.

Finding that Galella had 'insinuated himself into the very fabric of Mrs. Onassis' life. . .' the court framed its relief in part on the need to prevent further invasion of the [movant's] privacy.

.    .    .

The court's findings on credibility are indeed broad, but they are supported in the record. Galella demonstrated a galling lack of respect for the truth and gave no indication of any consciousness of the meaning of the oath he had taken. Not only did he admit blatantly lying in his testimony, he admitted attempting to have other witnesses lie for him.

For our part, we were equally positive:

The record establishes at least these differences between the behavior of other photographers and reporters and the attack of the paparazzo: . . . Galella's phys-

ical movements were always unnerving and often frightening. Many witnesses testified to his 'jumping', 'lunging', 'leaping', 'rushing out', 'snaking in and out', 'dashing at me', 'touching', 'bumping', 'scuffling', 'blocking', 'thrusting' his camera and circling (sometimes with assistants) in close orbit about [Mrs. Onassis] and her children . . . . The constancy of this Galella practice, applied by him with such unrestrained and relentless vigor, borders on the cruel.[157]

.    .    .

He was like a shadow: everywhere [Mrs. Onassis] went he followed her and engaged in offensive conduct; nothing was sacred to him. . . While [Galella] denied so deporting himself, his admissions clearly spell out his harassment of [Mrs. Onassis] and her children.

.    .    .

Galella has insinuated himself into the very fabric of Mrs. Onassis' life and the challenge to this Court is to fashion the tool to get him out.

.    .    .

We find that the totality of plaintiff's conduct was extreme, intentional and outrageous, and that the emotional distress experienced by [Mrs. Onassis] and her children was severe and reasonably so. . . [T]here is substantial basis for their reactions and concerns; they were indeed harassed, threatened and denied privacy by [Galella's] offensive conduct. The proof establishes the tortious infliction of mental distress.[158]

By his reprehensible conduct Galella has proven indeed what was anticipated years ago and succinctly expressed by the Court of Appeals footnote:

hands before him as if holding a camera. He positioned his legs fairly wide apart and bounded, stiff-kneed, in a close semicircle in front of his imaginary subject, his heels pounding heavily against the floor—more ape than man." *Galella, supra,* 353 F.Supp. at 216.

156. *Galella, supra,* 487 F.2d at 994.

157. We also noted: "Agent Keller made an especially effective witness by his demonstration which followed our request: 'Now, I know what the word 'jump' means. I have heard the testimony over and over again, using that word . . . please step down and show me . . . what you saw Mr. Galella do.' (4531) Agent Keller demonstrated what he had seen Galella do on many occasions. He crouched slightly with

158. *Galella, supra,* 353 F.Supp. at 210, 216, 228, 231.

*. . . No voluntary change in his technique can be expected.* (emphasis ours)

The issue, plain and simple, is how to positively and effectively stop Galella's unbridled behavior which we find rampant and legally irresponsible in the extreme. The law prescribes the steps to unequivocally resolve the challenge:

Rule 44(c):

In the event the alleged contemnor is found to be in contempt of court, an order shall be made and entered (1) reciting or referring to the verdict or findings of fact upon which the adjudication is based; (2) setting forth the amount of damages to which the complainant is entitled; (3) fixing the fine, if any, imposed by the court, which fine shall include the damages found, and naming the person to whom such fine shall be payable; (4) stating any other conditions, the performance whereof will operate to purge the contempt; and (5) directing the arrest of the contemnor by the United States marshal and his confinement until the performance of the condition fixed in the order and the payment of the fine, or until the contemnor be otherwise discharged pursuant to law. Unless the order otherwise specifies, the place of confinement shall be the Metropolitan Correction Center.... A certified copy of the order committing the contemnor shall be sufficient warrant to the marshal for the arrest and confinement. The aggrieved party shall also have the same remedies against the property of the contemnor as if the order awarding the fine were a final judgment.

To that end, we will take evidence properly appropriate to the occasion, hear argument, consider thorough and complete memoranda, etc. at a time to be fixed in the near future.

\* \* \* \*

This opinion constitutes our findings of fact and conclusions of law pursuant to Local Rule 44(c).

SO ORDERED.